## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| 10x GENOMICS, INC. and PROGNOSYS BIOSCIENCES, INC., | |
| Plaintiffs, | |
| v. | C.A. No. 23-cv-1375-MN |
| CURIO BIOSCIENCE, INC., | |
| Defendant. | |

## DEFENDANT CURIO BIOSCIENCE, INC.'S ANSWER AND FIRST AMENDED COUNTERCLAIMS TO PLAINTIFFS' COMPLAINT FOR PATENT INFRINGEMENT

Defendant Curio Bioscience, Inc. ("Curio") hereby submits this Answer to Plaintiffs 10x Genomics, Inc. ("10x") and Prognosys Biosciences, Inc.'s ("Prognosys") Complaint for Patent Infringement (D.I. 1, the "Complaint"). Curio denies all allegations not expressly admitted, and responds as follows:

1.      Curio admits that Paragraph 1 purports to describe this as an action for patent infringement. Curio is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 1 of the Complaint, and therefore Curio denies these allegations.

2.      Curio is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 2 of the Complaint, and therefore Curio denies these allegations.

3.      Curio is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 3 of the Complaint, and therefore Curio denies these allegations.

4.      Curio admits that it is a Delaware corporation with its principal place of business in Palo Alto, California.

5.      This paragraph calls, at least in part, for a legal conclusion for which no response is required. Otherwise, Curio admits that the Complaint purports to set forth claims arising under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.* For the purpose of this action only, Curio does not contest subject matter jurisdiction.

6.      This paragraph calls, at least in part, for a legal conclusion for which no response is required. Otherwise, Curio admits that it is a Delaware corporation, and for the purposes of this action only does not contest personal jurisdiction or venue.

7.      Curio is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 7 of the Complaint, and therefore Curio denies these allegations.

8.      Curio admits that there are instances in which DNA can be transcribed into mRNA, and instances in which such mRNA can then be translated into proteins. Curio admits that there are instances in which all of the mRNA expressed in a cell is referred to as a "transcriptome," and that some people refer to the study of transcriptomes as "transcriptomics." Curio admits that there are instances in which cell-by-cell analysis can preserve the heterogeneity of cells and their transcriptomes within a biological sample. Curio admits that there are instances in which a cancer tumor can consist of some cancerous and some non-cancerous cells, and there are instances in which cancerous cells within a tumor can vary and/or be susceptible to different therapeutics.

Otherwise, Curio is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 8 of the Complaint, and therefore Curio denies the allegations.

9.      Curio admits that there are instances in which the study of gene activity of cells within their spatial context is sometimes referred to as "spatial transcriptomics." Curio admits that there are instances in which, by tracking the gene activity within a cell and its spatial context, it is possible to study the genetic make-up of cells in a sample and where in the sample those cells are found. Curio also admits that there are instances in which knowing the relationship between the genetic make-up of cells and their locations within a sample may help researchers gain a better understanding of certain biological processes and diseases. Otherwise, Curio is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 9 of the Complaint, and therefore Curio denies the allegations.

10.     Curio is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 10 of the Complaint, and therefore Curio denies these allegations.

11.     Curio is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 11 of the Complaint, and therefore Curio denies these allegations.

12.     Curio is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 12 of the Complaint, and therefore Curio denies these allegations.

13.     Curio is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 13 of the Complaint, and therefore Curio denies these allegations.

14.     Curio is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 14 of the Complaint, and therefore Curio denies these allegations.

15.     Curio admits that on November 17, 2022, 10x sent Curio a letter. Curio also admits that on June 14, 2023, 10x sent Curio a second letter that referenced U.S. Patent Nos. 10,662,468 and 11,001,879 and had Claim 1 from said patents allegedly copied and pasted therein. Neither letter posed any questions to Curio nor sought any other response, and Curio accordingly did not respond. Otherwise, Curio denies the allegations in Paragraph 15.

16.     Curio is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 16 of the Complaint, and therefore Curio denies the allegations in Paragraph 16.

17.     Curio admits that there has been public reporting regarding *10x Genomics, Inc. and Prognosys Biosciences, Inc. v. NanoString Technologies, Inc.*, Case No. 21-cv-653-MFK (D. Del.), including on GenomeWeb. Otherwise, Curio is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 17 of the Complaint, and therefore Curio denies the allegations in Paragraph 17.

18.     Curio admits that it announced the launch of its Curio Seeker product in February 2023. Otherwise, the Curio denies the allegations in Paragraph 18.

19.     Curio admits that its website explains that the Curio Seeker Kit preserves the spatial information of the transcriptome of a tissue sample of interest by capturing mRNA on spatially

- 4 -

indexed beads and then synthesizing cDNA through reverse transcription. Otherwise, Curio denies the allegations in Paragraph 19 of the Complaint.

20.     Admitted.

21.     Denied.

22.     Curio is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 22 of the Complaint, and therefore Curio denies these allegations.

23.     Curio admits that a document bearing the title U.S. Patent No. 10,480,022 is attached to the Complaint as Exhibit A, a document bearing the title U.S. Patent No. 10,662,468 is attached to the Complaint as Exhibit B, a document bearing the title U.S. Patent No. 11,001,879 is attached to the Complaint as Exhibit C, and a document bearing the title U.S. Patent No. 11,549,138 is attached to the Complaint as Exhibit D. Otherwise, Curio denies the allegations in Paragraph 23 of the Complaint.

24.     Paragraph 24 recites Plaintiffs' legal contentions and conclusions to which no response is required. To the extent a response is required, Curio is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 24 of the Complaint, and therefore Curio denies these allegations.

25.     Curio incorporates its answer to each preceding paragraph.

26.     Curio admits that Exhibit A attached to the Complaint, which the Complaint alleges is a copy of the '022 Patent, bears an issue date of November 19, 2019. Otherwise, this paragraph calls, at least in part, for a legal conclusion for which no response is required.

27.     Curio is without knowledge or information sufficient to form a belief as to whether Exhibit F is a copy of the assignment record for the '022 Patent. Otherwise, this paragraph calls,

at least in part, for a legal conclusion for which no response is required, and/or Curio is without

knowledge or information sufficient to form a belief as to the truth or falsity of the allegations

contained in Paragraph 27 of the Complaint, and therefore Curio denies these allegations.

28.     Denied.

29.     Denied.

30.     Denied.

31.     Denied.

32.     Denied.

33.     Denied.

34.     Denied.

35.     Curio incorporates its answer to each preceding paragraph.

36.     Curio admits that the Exhibit B attached to the Complaint, which the Complaint

alleges is a copy of the '468 Patent, bears an issue date of May 26, 2020. Otherwise, this paragraph

calls, at least in part, for a legal conclusion for which no response is required.

37.     Curio is without knowledge or information sufficient to form a belief as to whether

Exhibit G is a copy of the assignment record for the '468 Patent. Otherwise, this paragraph calls,

at least in part, for a legal conclusion for which no response is required, and/or Curio is without

knowledge or information sufficient to form a belief as to the truth or falsity of the allegations

contained in Paragraph 37 of the Complaint, and therefore Curio denies these allegations.

38.     Curio admits that 10x listed the '468 Patent in a letter 10x sent to Curio on or about

June 14, 2023. Otherwise, Curio denies the allegations in Paragraph 38 of the Complaint.

39.     Denied.

40.     Denied.

41.     Denied.

42.     Denied.

43.     Denied.

44.     Denied.

45.     Curio incorporates its answer to each preceding paragraph.

46.     Curio admits that Exhibit C attached to the Complaint, which the Complaint alleges is a copy of the '879 Patent, bears an issue date of May 11, 2021. Otherwise, this paragraph calls, at least in part, for a legal conclusion for which no response is required.

47.     Curio is without knowledge or information sufficient to form a belief as to whether Exhibit H is a copy of the assignment record for the '879 Patent. Otherwise, this paragraph calls, at least in part, for a legal conclusion for which no response is required, and/or Curio is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 47 of the Complaint, and therefore Curio denies these allegations.

48.     Curio admits that 10x listed the '879 Patent in a letter 10x sent to Curio on or about June 14, 2023. Otherwise, Curio denies the allegations in Paragraph 48 of the Complaint.

49.     Denied.

50.     Denied.

51.     Denied.

52.     Denied.

53.     Denied.

54.     Denied.

55.     Curio incorporates its answer to each preceding paragraph.

56.     Curio admits that Exhibit D attached to the Complaint, which the Complaint alleges is a copy of the '138 Patent, bears an issue date of January 10, 2023. Otherwise, this paragraph calls, at least in part, for a legal conclusion for which no response is required.

57.     Curio is without knowledge or information sufficient to form a belief as to whether Exhibit I is a copy of the assignment record for the '138 Patent. Otherwise, this paragraph calls, at least in part, for a legal conclusion for which no response is required, and/or Curio is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 57 of the Complaint, and therefore Curio denies these allegations.

58.     Denied.

59.     Denied.

60.     Denied.

61.     Denied.

62.     Denied.

63.     Denied.

64.     Denied.

65.     Curio incorporates its answer to each preceding paragraph.

66.     Denied.

67.     Curio is without knowledge or information sufficient to form a belief as to whether Exhibit J is a copy of the assignment record for the '030 Patent. Otherwise, this paragraph calls, at least in part, for a legal conclusion for which no response is required and/or Curio is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 67 of the Complaint, and therefore Curio denies these allegations.

68.     Denied.

69.     Denied.

70.     Denied.

71.     Denied.

72.     Denied.

73.     Denied.

74.     Denied.

75.     Curio denies the allegations contained in the Prayer for Relief of the Complaint and further denies that Plaintiffs are entitled to any relief whatsoever against Curio.

76.     Plaintiffs' demand for a trial by jury is not an allegation that requires a response. Curio also requests a trial by jury.

## AFFIRMATIVE DEFENSES

77.     Curio's investigation is ongoing. Curio reserves all defenses under the Federal Rules of Civil Procedure, the patent laws of the United States, other applicable state or federal laws, and any other defenses, at law or equity, that may exist now or in the future be available based on discovery and further factual investigation in this case.

78.     In support of the following defenses, Curio incorporates all of its Answers listed above, undertaking the burden of proof only as to those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated herein.

## FIRST AFFIRMATIVE DEFENSE

79.     Plaintiffs' claims are barred, in whole or in part, because U.S. Patent Nos. 10,480,022; 10,662,468; 11,001,879; 11,549,138; and 11,761,030 (the "Patents-in-Suit") are invalid for failing to comply with one or more provisions of Title 35 of the United States Code, including without limitation 35 U.S.C. §§ 101, 102, 103, 112 and 116.

## SECOND AFFIRMATIVE DEFENSE

80.     Curio has not infringed and does not infringe any of the claims of the Patents-in-Suit, either literally or under the doctrine of equivalents.

## THIRD AFFIRMATIVE DEFENSE

81.     Plaintiffs are estopped, by virtue of the cancellations, amendments, representations, disclaimers, and concessions made to the United States Patent and Trademark Office ("USPTO") during the prosecution of the Patents-in-Suit, from construing any claim of the Patent-in-Suit to have been infringed by Curio.

## FOURTH AFFIRMATIVE DEFENSE

82.     Plaintiffs' claims are barred in whole or in part, under the principles of equity, including, but not limited to, waiver, estoppel, acquiescence, and/or unclean hands.

## FIFTH AFFIRMATIVE DEFENSE

83.     To the extent that Plaintiffs' claims assert infringement under the doctrine of equivalents, they are barred in whole or in part under the Ensnarement Doctrine, which bars Plaintiffs from asserting an infringement theory under the doctrine of equivalents that encompasses, or "ensnares," the prior art.

## SIXTH AFFIRMATIVE DEFENSE

84.     Plaintiffs' claims are barred, in whole or in part, because they expressly or implicitly construe claims such that they read on the prior art.

## SEVENTH AFFIRMATIVE DEFENSE

85.     Plaintiffs' claims and/or its ability to recover damages are barred in whole or in part by 35 U.S.C. §§ 286, 287, 288, and/or 28 U.S.C. § 1498.

### A.     PRAYER FOR RELIEF ON PLAINTIFF'S COMPLAINT

WHEREFORE, Curio respectfully prays for the following relief:

A.      The Plaintiffs take nothing by their claims;

B.      That Plaintiffs' claims be dismissed with prejudice;

C.      That the court enter judgment against Plaintiffs and in favor of Curio in all respects, including with respect to non-infringement and invalidity;

D.      That the Court determine that this is an exceptional case under 35 U.S.C. § 285 and award attorneys' fees to Curio in this action;

E.      That Curio be awarded its costs; and

F.      For such other relief as the Court deems just and equitable.

## CURIO'S COUNTERCLAIMS

86.     Curio brings the following counterclaims against 10x and Prognosys pursuant to Rule 13 of the Federal Rules of Civil Procedure, and alleges as follows:

## NATURE OF THE ACTION

87.     This is an action against 10x and Prognosys for conspiracy to monopolize in violation of the Sherman Act and the Cartwright Act, and attempted monopolization against 10x in violation of the Sherman Act based on the prosecution of this sham litigation against Curio.

88.     Curio additionally seeks declaratory judgments of non-infringement and invalidity of U.S. Patent Nos. 10,480,022; 10,662,468; 11,001,879; 11,549,138; and 11,761,030.

## THE PARTIES

89.     On information and belief, 10x is incorporated under the laws of Delaware and has its principal place of business in Pleasanton, CA.

90.     On information and belief, Prognosys is incorporated under the laws of Delaware and has its principal place of business in San Diego, CA.

11328928                           - 11 -

91.     Curio is incorporated under the laws of Delaware and has its principal place of business in Palo Alto, CA.

92.     Curio is an early-stage biotechnology company—it has not yet completed its Series A financing round—focused on providing accessible research tools for the life sciences industry. The founders of Curio include Stephen Fodor, an entrepreneur who has founded multiple successful life sciences companies, including Affymetrix, and invented foundational technologies for microarray synthesis and fabrication, and Christina Fan, who co-invented foundational discoveries underlying the non-invasive prenatal testing (NIPT) field. Curio also licenses foundational intellectual property from the Broad Institute of MIT and Harvard, which it seeks to make available in a widely accessible and user-friendly manner.

93.     Curio's accused Seeker kit allows the spatial mapping of the entire transcriptome of fresh-frozen tissues at an industry-leading resolution. It is unique in the market in that the Curio Seeker kit provides users with a means to capture and spatially index mRNA in a sample to prepare a sequencing library. Those sequencing libraries can then be processed using widely available laboratory equipment and sequencing protocols, without requiring the user to purchase expensive new or additional instrumentation.

94.     Curio's Seeker kits each contain a slide, or tile, on which functionalized beads are disposed.



Each bead is indexed with a barcode, and includes a region consisting of a series of thymine (T) bases, forming a "poly-T" or "poly-dT" region. Because essentially all eukaryotic mRNA has what is known as a poly-adenylated (poly-A) tail, the poly-T regions on Seeker's beads are able to generically bind to any poly-adenylated nucleic acid molecules, resulting in an unbiased, whole transcriptome spatial gene expression map. No pre-selection of specific gene targets or design of complementary capture sequences to specifically bind such targets is required or performed. This allows users of Seeker to analyze any poly-adenylated RNA across a wide array of organisms and tissue types, which is not possible with many other existing technologies.

## JURISDICTION AND VENUE

95.     This action seeks a judgment that 10x and Prognosys engaged in unlawful anticompetitive practices under the antitrust laws of the United States and of the State of California. This action also seeks a declaration of non-infringement and invalidity with respect to the U.S. Patent Nos. 10,480,022; 10,662,468; 11,001,879; 11,549,138; and 11,761,030 (the "Patents-in-Suit") pursuant to 28 U.S.C. §§ 2201 and the patent laws of the United States of America, 35 U.S.C. § 1 *et seq*. An actual controversy exists under the Declaratory Judgment Act because 10x and Prognosys contend, and Curio denies, infringement, validity, and enforceability of the Patents-in-Suit.

96.     This Court has subject matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

97.     This Court has personal jurisdiction over 10x and Prognosys by virtue of both entities being incorporated under the laws of Delaware, as well as their waiver of any objections to personal jurisdiction through the filing of this and other lawsuits in the District.

98.     Venue is proper in this under 28 U.S.C. § 1391(b)(1) as both 10x and Prognosys are incorporated under the laws of Delaware.

11328928

## FACTUAL BACKGROUND

99.     On or about December 1, 2023, 10x and Prognosys filed a Complaint against Curio alleging infringement of the Patents-in-Suit.

100.     Curio has denied 10x and Prognosys's infringement allegations and has asserted that the Patents-in-Suit are invalid.

### A.     10x's Abuse of the Patent System to Stifle Innovation and Competition

101.     This case is one of a larger collection of anti-competitive lawsuits brought by 10x and its co-conspirators seeking to stifle innovation, squash competition, and create a monopoly in the nascent field of spatial genomics, including spatial transcriptomics. Industry publications recognize 10x is "aggressively" asserting its IP in the "burgeoning spatial genomics technology market." Consistent with this "aggressive" strategy, 10x has instituted baseless litigation against Vizgen Inc., which offers the competitive MerFish and MerScope platforms, as well as NanoString Technologies Inc., which offers the competitive CosMx spectral molecular imager and GeoMx digital spatial profiler. Through its campaign, 10x has already forced NanoString—a company which had a market capitalization of roughly $3 billion in 2021 when it was first targeted by 10x— into Chapter 11 Bankruptcy. Having already eliminated potential competition through its acquisitions of, *inter alia*, ReadCoor, Inc., Cartana AB, Spatial Transcriptomics AB, and substantially all assets of Prognosys, 10x is attempting to use acquisitions, patent aggregation and objectively baseless litigation to obtain monopoly power in the spatial transcriptomics market, and it will likely succeed in this objective if it is able to harass Curio, Nanostring, and Vizgen out of the market.

102.     More generally, 10x has a history of using litigation against early-stage prospective rivals to attempt to bully them off the market before they have an opportunity to become

established. For example, in 2022, 10x sued Parse Biosciences, an emerging company in the single

cell analysis space that only launched in 2021, before Parse even had its first round of financing.

103.    Applying the same playbook it used against Parse, 10x set its sight on Curio, a

company at a far earlier stage than even Parse was when 10x sued it. Now, Curio—like the other

companies that have made it into 10x's crosshairs for daring to innovate in spatial biology—faces

the choice of diverting its attention and funding to vigorously defend against 10x's baseless claims,

or to simply exit the market.

104.    These troubling facts are well known in the market. In February 2024, leading

researchers in the field[1] —consumers in the product market at issue in 10x's litigation campaign—

"sounded an alarm" over 10x's predatory conduct.[2] They observed:

> Unfortunately, the promise of spatial biology technologies has become clouded by
> a troubling reality: the clash of profit, power, and attempted monopolization. What
> should be headlines of groundbreaking advancements in fatal diseases through the
> use of spatial biology are now headlines dominated by legal disputes waged by
> powerful companies. Instead of international collaborations driving biomedical
> progress, conversations have shifted to technology restrictions and legal battles.

---

[1] The researcher-authors included Miranda E. Orr, PhD, associate professor, gerontology and geriatric medicine, Wake Forest University School of Medicine. Arutha Kulasinghe, PhD, group leader, Clinical-o-Mx Lab, Faculty of Medicine, University of Queensland. Grant R. Kolar, MD, PhD, professor of pharmacology and physiology, Saint Louis University. Holger Heyn, PhD, team leader, Single Cell Genomics Group, Spanish National Center for Genomic Analysis. Jasmine Plummer, PhD, associate member, St. Jude Faculty, and director, Center for Spatial OMICs. Lasse Sommer Kristensen, PhD, associate professor, Department of Biomedicine, Aarhus University. Jorgen Kjems, PhD, professor, Department of Molecular Biology and Genetics, Aarhus University. Gordon Mills, MD, PhD, professor of cell, developmental and cancer biology and director of precision oncology, Knight Cancer Institute, Oregon Health and Science University. Juan J. Garcia-Vallejo, PhD, associate professor, Molecular Cell Biology and Immunology, Amsterdam University Medical Centers, I.J. Nijman, PhD, manager, Utrecht Sequencing Facility, Bioinformatic Facility, and High Performance Compute Facility. University Medical Center Utrecht (Center for Molecular Medicine) and the Netherlands X-omics Institute. Nicholas P. West, PhD, associate professor, Central Facility for Genomics and School of Pharmacy and Medical Science, Griffith University. Amanda Cox, PhD, senior lecturer, Central Facility for Genomics and School of Pharmacy and Medical Science, Griffith University.

[2] https://www.genengnews.com/topics/omics/sounding-an-alarm-over-spatial-biology/

*The focus is no longer on impactful discoveries, but on which companies are at risk of succumbing to legal pressures from deep-pocketed powerhouses*. It is a concerning twist in a narrative that should be about advancing science for the greater good.

Moreover, these researchers highlighted the fact that the predatory actions of 10x have "driven the closure of promising companies that were unable to navigate the negative repercussions of these disputes." The consequences could not be clearer: 10x's pattern of baseless sham litigations "is discouraging emerging companies with groundbreaking solutions in spatial biology from patenting and publicizing their innovations, fearing potential lawsuits." 10x's "short-term gains" thus "come at the cost of losing valuable contributions to long-term advances in biology," with its sham litigation campaign "casting a shadow over scientific innovation and biomedical progress."

105.    While the researchers did not refer to 10x by name, it was not lost on 10x that these researchers were referring specifically to 10x's predatory behavior. Shortly after the "Sounding an Alarm Over Spatial Biology" article was published, 10x posted to its website a counter-narrative attempting to defend its anticompetitive conduct. 10x's CEO, Serge Saxonov, is reported to have admitted to the media that "10x issued the letter after several academic researchers, many of them customers, echoed criticisms of the company made by some of its competitors in a pointed commentary published last month in GEN."[3]

106.    This lawsuit is one of the latest components of 10x's anti-competitive scheme. 10x is well aware that if it succeeds in harassing Curio out of the market, its Visium product line will have one less competitor in the market, helping to cement its market dominance.

107.    As detailed herein, 10x (alone, and in concert with Prognosys) has engaged in objectively baseless sham litigation against Curio meant to spread fear, uncertainty, and delay in

---

[3] https://www.genengnews.com/topics/omics/10x-defends-patent-litigation-strategy-after-criticism-from-researchers-rivals/

the marketplace, to impose unnecessary and unfair litigation expenses on Curio, and to harm, if not outright eliminate, Curio's commercial relationships with existing and potential customers.

108. 10x openly admits that it has never made use of the Chee patents at issue in this case in any of its products, nor has it relied on the alleged expertise of Dr. Chee and Prognosys to develop its spatial biology offerings. Indeed, in the instant Complaint, 10x emphasizes the importance of technology it acquired from a wholly different entity—Spatial Transcriptomics AB—as being the foundation for its spatial transcriptomics platform. D.I. 1 at ¶¶9-11. The discussion of Prognosys and Dr. Chee is an afterthought, relegated to a paragraph where 10x vaguely claims to "license[] foundational intellectual property for performing spatial transcriptomics." *Id.* ¶14.

109. 10x's own actions confirm that the Chee patents are anything but foundational. For example, in prior litigation, 10x's Chief Technology Officer, Dr. Michael Schnall-Levin testified that despite 10x "really deeply investigating spatial technologies" by 2017, "we were not aware of Prognosys," "we weren't aware of the Mark Chee patents," and "we weren't aware of the details of what Mark Chee was doing." *Prognosys Biosciences, Inc. v. NanoString Technologies, Inc.*, Case No. 21-cv-653-MFK (D. Del.), D.I. 182-2.

110. The Complaint asserts that "Dr. Chee is a celebrated leader in the genomics and proteomics field." D.I. 1 at ¶14. Yet after licensing the Prognosys patents and during work on its own spatial analysis technologies, 10x did not meet with Dr. Chee, nor was Dr. Schnall-Levin aware of anyone in 10x's spatial analysis group (which he controlled as CTO) having "any communications with anyone at Prognosys regarding the development of spatial analysis technology." *Prognosys Biosciences, Inc. v. NanoString Technologies, Inc.*, Case No. 21-cv-653-MFK (D. Del.), D.I. 182-2. If Dr. Chee's patents and knowledge truly were "foundational," why

would 10x completely ignore its relationship with a "celebrated leader" whose expertise it had just acquired for millions of dollars?

111.    The reality is that 10x acquired the Chee patents—which it wasn't even aware of for at least 7 years after they were filed—because it, including specifically co-founder and Chief Scientific Officer Ben Hindson, as well as in-house counsel, Randy Wu, viewed them as "useful trading cards, particularly against some of the bigger companies." *Prognosys Biosciences, Inc. v. NanoString Technologies, Inc.*, Case No. 21-cv-653-MFK (D. Del.), D.I. 326-9 at 6-7. As it turns out, 10x is now the bigger company, and is using these patents for even more nefarious purposes: as a business tool to interfere with and destroy any company that dare enter the spatial transcriptomics market.

**B.    After Acquiring Spatial Transcriptomics AB and Exclusively Licensing the Chee Patents, 10x Redrafts the Chee Patents to Claim After-Arising Technology**

112.    On information and belief, 10x acquired Spatial Transcriptomics AB in December 2018. In 2016, the Swedish research group that had founded Spatial Transcriptomics AB published an article titled "Visualization and analysis of gene expression in tissue sections by spatial transcriptomics."[4] Stahl disclosed "a strategy, which we call 'spatial transcriptomics,' that allows visualization and quantitative analysis of the transcriptome with spatial resolution in individual tissue sections." The authors proposed doing so by "positioning histological sections on arrayed reverse transcription primers with unique positional barcodes."

---

[4] Stahl et al., "Visualization and analysis of gene expression in tissue sections by spatial transcriptomics," Science Vol. 353 Issue 6294 (July 1, 2016) ("Stahl").



113.    As shown in the figure above, Stahl suggested the capture of mRNA from the tissue section by using poly-T capture agents to generically bind to all mRNA in the sample. This step would be followed by reverse transcription of the captured mRNA, preparation of sequencing libraries, and sequencing. Stahl further suggested the design of its capture probes, which were nucleic acids affixed to a solid support which also contained a "spatial barcode" and a poly-T "mRNA capture region." This arrangement permitted the tissue section to interact with the probes when laid on top of the probe array.



114.    On information and belief, 10x exclusively licensed the Chee patents from Prognosys in October 2018. On information and belief, 10x took over control of prosecution of

11328928

the Chee patents at that time. On information and belief, as the inventor and controlling shareholder of Prognosys, Dr. Chee and Prognosys are still involved in the prosecution of the Prognsosys patents, including through the signing of necessary oaths and/or declarations, including oaths and/or declarations stating that Dr. Chee is the true inventor of the subject matter of claims presented to the Patent Office.

115.    Shortly after the Spatial Transcriptomics AB acquisition was complete, 10x then began strategically prosecuting the Chee patents (which allegedly have an April 2010 priority date) to attempt to claim variations of the disclosures made by Stahl years later in 2016. For example, in the patents from the Chee family prosecuted prior to 10x's control, Prognosys sought claims directed to the targeted delivery of probes to a tissue sample affixed to a solid support. This is consistent with the specification of the Chee patents, the asserted novelty of which focuses exclusively on the delivery of probes to a sample that has been affixed to a solid support. U.S. Patent No. 9,371,598 (pre-10x) at FIGS 1-2.



FIG. 1



FIG. 2

11328928

116.    Indeed, the specification concedes: "***Integral to the assay system of the invention***
is instrumentation that allows for spatial patterning of reagents ***onto*** the biological sample." '598
Patent at 15:51-53. The specification also notes that a critical feature of the alleged invention is its
use with "virtually any biological sample or samples that can be affixed to a support." *Id.* at 13:47-
49. After affixing the sample to a support, the specification exclusively discloses delivering
reagents, including encoded probes, from "on and/or above"—but never from below—"the
substrate-affixed biological sample." *Id.* at 16:25-41.

117.    Consistent with these admissions, the claims of the '598 patent are directed to
"delivering encoded probes for a biological target to multiple sites in a sample affixed to a
support," "delivering an oligonucleotide probe capable of specific hybridization with a nucleic
acid target to multiple sites in a sample affixed to a support," and/or "delivering a probe capable
of specific binding to a biological target to multiple sites in a sample affixed to a support."

118.    On February 14, 2019, named applicant Prognosys filed Patent Application
No. 16/276,235. The '235 Application ultimately issued as the asserted '022 patent.

119.    On information and belief, prosecution of the '235 Application was controlled by 10x.



120.    On March 15, 2019, 10x entered a preliminary amendment purporting to provide a substitute specification "to include text from U.S. Provisional Application Serial No. 61/321,124, filed April 5, 2010." In this amendment, 10x presented newly-drafted claims directed to the delivery of a tissue sample to a plurality of binding agents on a solid support.

2.     (**New**) A method for determining a spatial location of a biological molecule of a tissue sample comprising

(a) providing a plurality of beads in a spatial pattern, wherein the plurality of beads comprise a plurality of binding agents, wherein a binding agent of the plurality of binding agents (i) comprises a coding identifier having a nucleic acid sequence and (ii) is configured to interact with a biological molecule of a tissue sample, wherein the coding identifier corresponds to a location in the spatial pattern at which the binding agent interacts with a biological molecule of a tissue sample;

(b) contacting the plurality of beads with the tissue sample such that the binding agent interacts with the biological molecule;

(c) using the coding identifier to identify the location in the spatial pattern where the binding agent interacted with the biological molecule, thereby determining a spatial location of the biological molecule of the tissue sample.

3.     (**New**) The method of claim 2, wherein the plurality of beads is provided on a substrate surface.

121.    These claims are consistent with the 2016 approach suggested by Stahl, in which a tissue slice is delivered to an array of binding agents affixed to a solid support. But such an approach is disclosed nowhere in the Chee patents' specification either as originally filed, or as amended after 10x took over prosecution.

122.    On information and belief, 10x has prosecuted numerous continuation applications in this same manner, including the Patents-in-Suit, attempting to, and succeeding, in pushing through the USPTO claims for which its specification provides no legitimate basis for support.

**C.    10x's Infringement Allegations Against Curio are Objectively and Subjectively Baseless**

**1.    10x Has Taken Positions Before The USPTO That Confirm the Baselessness of its Infringement Theory**

123.    This is not a garden-variety dispute in which non-infringement turns on claim construction arguments over which reasonable minds could disagree. As shown in the chart of 10x's infringement allegations reproduced below, central to 10x's infringement theory is the argument that Curio's Seeker product contains capture agents that specifically bind a target nucleic

acid based on the allegation that there is "specific binding" between poly-dT capture agents and the poly-A tail ubiquitously present on all mRNA molecules. The poly-dT capture agents in Curio's Seeker product generically bind to **any** mRNA molecule through their poly-A tails. Such binding results in the random capture of many distinct biological molecules,[5] rather than the targeted capture of a predetermined, specifically-targeted biological molecule.



124.    10x's infringement theory is irreconcilable with the positions it has taken in its case against Parse Biosciences. *See 10x Genomics, Inc. v. Parse Biosciences, Inc.*, No. 22-cv-01117 (D. Del.); *Parse Biosciences, Inc. v. 10x Genomics, Inc.*, Nos. IPR2023-00955, -00958, -00876 (PTAB). There, in attempting to preserve the validity of different 10x patents in *inter partes* review proceedings, 10x unambiguously took the position that base-pairing interactions between the poly-

---

[5] For example, it is estimated that a given mammalian cell may contain approximately 360,000 mRNA molecules.

A tail of mRNA and a poly-dT capture agent is **not specific**. *See* IPR2023-00955, Paper No. 9 (September 21, 2023 POPR) at 49-50.

125.    In *Parse*, 10x drew a stark contrast between two prior art references—Linnarsson and McCloskey—alleged to render its U.S. Patent No. 10,240,197 invalid. In its petition challenging the '197 patent, Parse described Linnarsson as teaching the hybridization (also referred to as binding or annealing) between a series of thymines (poly-T) and the poly-A tail of an mRNA strand. *Id*., Paper 1 (Petition) at 17 (excerpted below).



Specifically, Linnarsson discloses a cDNA synthesis primer ("CDS") (boxed in green) that includes a sequence of thymines (highlighted in green) and that "directs synthesis of a cDNA strand" by hybridizing with a sequence of adenine nucleotides making up the poly-A tail (highlighted in red) of an mRNA strand (boxed in red).   This is shown in both Figures 1 and 11 of Linnarsson:

EX1003 at Fig. 2.

126.    On September 21, 2023, to argue that the teachings of Linnarsson were incompatible with teachings from McCloskey, 10x explained with respect to Linnarsson:

> **Linnarsson's CDS tags are designed to** analyze gene expression and **anneal to every mRNA molecule in the sample** in connection with reverse-transcribing it into cDNA; indeed, Petitioner admits that **the tags in Linnarsson's CDSs anneal to every mRNA molecule for example, to mRNA's poly-A tail**. Pet.17; EX1003, 24:13-20, Fig.2. Similarly, Linnarsson's TSO tags are designed as part of the gene expression analysis to universally anneal "to the series of cytosine nucleotides at the end of the newly-synthesized [cDNA] strand." Pet. 18-19; EX1003, 18:1926. In other words, **Linnarsson's tags** are designed to anneal to each and every mRNA and/or cDNA to analyze gene expression, and they **are not designed to anneal solely to a particular gene or allele**; nor does Petitioner claim they are.

127.    In its discussion of McCloskey, 10x contrasted Linnarsson's nonspecific or generic binding approach, on the one hand, with McCloskey's binding agents that are "designed to anneal solely to a particular gene or allele" through specific binding, on the other hand. Indeed, 10x described the specific binding of McCloskey's tags as a totally divergent approach from non-specific, universal mRNA annealing present in Linnarsson's polyT/polyA non-specific binding:

> ***McCloskey's tag***, in contrast, has a "3' genomic target binding site" that ***anneals only to a DNA sequence specific to the genomic target binding site and is particular only to the specific gene (and targeted DNA sequence) to which it is designed to bind***. EX1004, 3-4; Pet.21-23. But nowhere does Petitioner address the distinction between the t***ags in McCloskey, which anneal to a <u>specifically</u> targeted sequence***, and ***the CDS and TSO tags in Linnarsson, which <u>generically anneal to each and every mRNA</u>*** and reverse-transcribed cDNA strand.

128.    Slightly over two months later, on December 1, 2023, 10x filed this lawsuit, asserting infringement based on the exact opposite premise: that polyT/polyA binding is specific. 10x's infringement theory for each asserted patent explicitly embraces this contradiction—and is therefore objectively baseless—by asserting that polyT/polyA binding is specific for a particular target nucleic acid. *See* D.I. 1, Exs. K-O (claim charts documenting 10x's objectively baseless infringement allegations). For example, the claims of the '468 and '879 patents require a capture agent that "specifically binds" or that is "specifically bound to" a target nucleic acid. The '022 patent requires a "binding agent" that is "configured to interact with ***a*** biological molecule," such as a specific protein, small molecule, or nucleic acid, rather ***any*** biological molecule of an infinite genus (*e.g.*, all mRNAs). In turn, the '022 patent **<u>expressly</u>** defines "binding agent" as an "agent that ***specifically binds*** to ***a*** biological molecule of interest." '022 Patent at 4:56-58 (under "DEFINITIONS" heading).  And the '138 and '030 patents require a "***target***-binding domain" and a "***target*** nucleic acid that binds to a ***target nucleic acid*** binding domain," respectively. *See* '138 Patent at 6:54-65 (explaining that when a "binding partner binds to its ***particular 'target'***

*molecule*," it "*does not bind* in a significant amount *to other molecules* present in the sample," and thus "selectively binds" its binding partner or target through "specific binding").

129.   However, and in complete contradiction to the position 10x took before the USPTO's PTAB just two months earlier, "nowhere does [10x] address the distinction between the [claimed capture agents], which anneal to a specifically targeted sequence" by "specifically binding," and the poly-dT capture agents in Curio's Seeker product, "which generically anneal to each and every mRNA" species present in a tissue sample.

130.   The reason for this is simple: 10x brought this lawsuit solely for the purpose of harming a fledgling startup; not because it had legitimate intellectual property rights to enforce. 10x's September 21, 2023 admissions in *Parse* confirm that it knew this infringement theory was baseless before it brought suit.

        **2.**     **10x Knew that the Chee Specification Does Not Support the Asserted Patents**

131.   Because Curio's Seeker product contains only poly-dT capture agents, each and every capture agent present on a Seeker tile is the same.

132.   In U.S. Patent Application No. 16/443,771, which is a parent application of the asserted '468 patent, 10x attempted to obtain claims where the array comprised a universal target binding agent (such as, e.g., a polyT binding agent):

2. (Currently Amended) An array comprising a substrate and a plurality of encoded probes, wherein:

the substrate comprises at least one fiducial marker;

an encoded probe of the plurality of encoded probes comprises: (i) a biological target-binding agent and (ii) a coding identifier comprising a sequence, wherein the encoded probe of the plurality of encoded probes is attached to a location on the substrate, and the sequence of the coding identifier of the encoded probe identifies the location on the substrate,

wherein each encoded probe of the plurality of encoded probes comprises the same biological target-binding agent.~~, and~~

~~the plurality of encoded probes are immobilized onto locations on the substrate in a pre-defined spatial pattern.~~

133.    Its attempt to obtain such claims confirms the objective baselessness of its infringement allegations here for at least two reasons.

134.    First, under the doctrine of claim differentiation, "the same biological target-binding agent," i.e., a "universal" binding agent, necessarily must be distinct from a binding agent that "specifically binds" a specific target biological molecule, such as those "designed to anneal solely to a particular gene or allele."

135.    Second, the File History of the '771 patent confirms that 10x and Prognosys know that the Chee patents' specification lacks written description support for the claims under the construction required for their infringement theory.

136.    In attempting to justify the addition of the limitation "wherein each encoded probe of the plurality of encoded probes comprises the same biological target-binding agent" to the then-pending claims, 10x and Prognosys made the incredible assertion that this limitation was supported by the fact that the specification disclosed the opposite: "Paragraph [0097] specifies that *the claimed composition can include the use of different binding agents*." '771 Application (June 17, 2019 Remarks). 10x attempted to deceive the examiner into accepting this argument with the

unjustifiable legal argument that "M.P.E.P. ¶2173.05(i)…states that '[i]f alternative elements are positively recited in the specification, they may be explicitly excluded in the claims.'"

137.    The Examiner aptly rejected this frivolous argument: "Applicant appears to assert that any mention of different binding agents supports a claim drawn to a support wherein all binding agents are the same. However, it is the opinion of the examiner that the instant specification *does not positively recite <u>alternatives</u> so as to provide support for the newly defined support wherein <u>each target-binding agent is the same.</u>*" '771 Application (February 5, 2021 Final Rejection).

138.    At a subsequent interview, the Examiner further confirmed the lack of support in the Chee patents' specification for an array having the same target-binding agent at each position, such as an array with only poly-T capture agents. The Examiner correctly noted that the paragraphs 10x pointed to as support "do[] not disclose any universal aspect for the probes so as to support a claim drawn to all probes having the same target-binding agent."

> **Date of Interview:** <u>21 June 2021</u>
>
> **Issues Discussed:**
>
> **35 U.S.C. 112**
> Applicant asserted that paragraphs 92-93 of the specification provides support for target-specific binding agents and suggested that this teaching provides support for an opposite interpretation i.e. common binding agent for all encoded probes. It is the opinion of the examiner that the cited passage does not disclosed any universal aspect for the probes so as to support a claim drawn to all probes having the same target-binding agent.

139.    Following this interview, 10x did not dispute the content of the interview summary, attempt to correct the record, or otherwise respond to the then-pending final rejection. Instead, it allowed the rejected application to go abandoned.

140.    Undeterred by the USPTO's clear statement of what Dr. Chee did not invent, 10x and Prognosys, with knowledge that the asserted claim scope is not supported by the specification

of the Chee patents, instead brought this objectively baseless sham litigation. Because of its overarching goal of eliminating all competition to monopolize the spatial transcriptomics market, 10x filed this lawsuit by simply stretching the bounds of other patents to mire Curio in litigation on claim scope 10x was unable to obtain by legitimate means.

>        **3.      10x and Prognosys Further Their Anticompetitive Sham Litigation By Making Additional Objectively Baseless Claims Against Curio's Trekker Products**

141.    On or about March 12, 2024, Curio announced that it would begin commercializing a product called Curio Trekker, which is a licensed implementation of a groundbreaking technology known as "Slide-tags." The Slide-tags technology was developed by the Broad Institute research team that also developed the Slide-seq technology underlying Curio Seeker. The "Slide-tags" technology was published in the journal *Nature* in December 2023. *See* Andrew J.C. Russell et al., *Slide-Tags Enables Single-Nucleus Barcoding for Multimodal Spatial Genomics*, 625 NATURE 101 (2024) (accessible online December 13, 2023) (hereinafter "Russell et al.").

142.    The Slide-tags/Curio Trekker technique is fundamentally different from the techniques used in Slide-seq/Curio Seeker, let alone the claims of the Asserted Patents. In Slide-tags/Curio Trekker technique, an array of beads to which spatial barcodes are attached with a photo-cleavable linker is provided. When a tissue slice is applied to the array, the barcodes are released through ultraviolet (UV) light exposure, and the spatial barcodes diffuse into the tissue slice. Through this process, the Slide-tags/Curio Trekker technology "donates" the spatial barcode to nuclei of cells in the tissue slice, and the barcode is then present in the nuclear milieu along with the native nucleic acids that existed in the nucleus prior to barcode donation. The nuclei containing donated spatial barcodes can then be isolated and processed according to the protocols and techniques for existing, commercially available, single-cell nucleic acid sequencing tools. These

tools may then sequence the entire population of nucleic acids present in the nuclei, including the native nucleic acids that were present before barcode donation, as well as the donated barcodes.



143.    Commentators quickly noted that the Slide-tags/Curio Trekker technology was fundamentally different from technologies that existed in December 2023, observing that the technique, "turned spatial transcriptomics on its head."[6] Those in the field also immediately recognized and appreciated that Slide-tags/Curio Trekker do not involve binding interactions (as claimed by the Asserted Patents): ***"Rather than having RNA bind barcodes*** on beads, [the authors of Russell et al.] released the ***barcodes to seep into cells*** of a tissue slice."[7]

144.    Nevertheless, following Curio's March 12, 2024 announcement, on April 1, 2024, Plaintiffs served an "Amended Disclosure Pursuant to Paragraph 4 of the Delaware Default for Discovery," which purported to identify, among other things, the "Curio Trekker 10 x 10 kit" and ancillary goods, products, and services used with Curio Trekker Kits as Accused Products, Methods, and/or Instrumentalities. Plaintiffs did not identify any patent or claim allegedly infringed by Curio Trekker, as would be required, for example, to amend the complaint to accuse Curio Trekker, let alone set forth the basis for their allegations.

145.    On June 7, 2024, Plaintiffs served their Initial Infringement Contentions, which set forth infringement allegations against Curio Trekker as to the '022, '138, and '030 patents. In these

---

[6] https://www.alzforum.org/news/research-news/slide-tags-method-sharpens-spatial-transcriptomics

[7] *Id.* (emphasis added)

Initial Infringement Contentions, Plaintiffs affirmatively rely on Russell et al. in support of their accusations against Curio Trekker. Yet, taking the '022 Patent contentions as an example, Plaintiffs contend that "Curio's core technical production is deficient and does not show, among other things, how the barcoded oligo tags the nuclei of the tissue sample." Thus, 10x merely assumes limitations are met, attempting to use an alleged lack of information as a substitute for a failure to conduct a reasonable factual investigation before asserting infringement.

146.    Despite Plaintiffs' claims to the contrary, 10x and its collaborators have had in their possession since at least December 2023 adequate information to determine "how the barcoded oligo tags the nuclei of the tissue sample" in Slide-tags/Curio Trekker. That information shows that Slide-tags/Curio Trekker operates in a fundamentally different manner than the claims of the Asserted Patents, confirming that Plaintiffs' infringement allegations as to Curio Trekker are objectively baseless.

147.    Indeed, Plaintiffs' complaints that they lacked sufficient information to assess infringement by Curio Trekker are belied by their own advisor and collaborator's praise of the Slide-tags/Curio Trekker technology in a companion article introducing Russell et al. to *Nature*'s readership. *See* Patrik L. Ståhl, *Gene Expression of Single Cells Mapped in Tissues*, 625 NATURE 38 (2024) (accessible online December 13, 2023) ("On page 101, Russell et al. present a tool they name Slide-tags…."). The substance of this commentary is discussed further below.

148.    As an initial matter, the Ståhl commentary is especially notable given the author's declaration of "competing interests": "P.L.S.[8] is a scientific consultant to 10X Genomics, which holds intellectual-property rights to single-cell and spatial technology." Moreover, on information and belief, Dr. Ståhl widely publicizes his affiliation and ongoing relationship with 10x, stemming

---

**8** Patrik L. Ståhl.

from 10x's acquisition of Spatial Transcriptomics AB: "***Our lab is in a continuous collaboration with 10x Genomics*** and leading the scientific progress made within the area of spatially resolved transcriptomics."[9]

149.    Moreover, the Ståhl commentary was published online on or about December 13, 2023, ***after*** 10x had already sued Curio.

150.    In substance, the Ståhl commentary clearly describes how Slide-tags/Curio Trekker works, confirming that there was no basis for Plaintiffs to allege that this technique infringes the Asserted Patents. Ståhl explains that Slide-tags/Curio Trekker:

> start[s] by covering a glass microscope slide in a layer of beads. Each bead is 10 micrometers wide, resulting in pixels of the same size. Attached to each bead is a string of DNA with a unique sequence, known as a DNA barcode. Because the barcoded beads are randomly distributed on the surface of the slide, the location of each DNA barcode must be identified before a thin section of tissue is added on top of the barcoded beads.

> The DNA barcodes are then released from the beads using ultraviolet light, and ***diffuse*** up into the tissue. Several barcodes will ***diffuse*** into the nucleus of each cell in the tissue, effectively 'tagging' the cell with the spatial identifier. The authors can then map the cell back to its original location in the tissue according to the combination and relative amount of DNA barcodes in it.

151.    Ståhl further provides the Figure depicted below (red annotations added), which shows that in Slide-tags/Curio Trekker, released oligonucleotides donate nucleic acid barcodes to the nuclei of cells via diffusion, not hybridization of any kind.

---

[9] https://www.spatialresearch.org/who-we-are/ ("The groups led by PIs Joakim Lundeberg, Patrik Ståhl, and Stefania Giacomello (KTH Royal Institute of Technology) work closely together and we have our lab at the Science for Life Laboratory (SciLifeLab).").



152.    10x's consultant unequivocally praised the novel and innovative Slide-tags/Curio Trekker technology. He observed that "[t]his work fills a substantial gap in the field: in-depth data about the molecular content of single cells can now be mapped at high resolution," and that "Slide-tags is a marked improvement on existing single-cell and spatial genomics techniques." And importantly, as noted above, Dr. Ståhl clearly explained the fundamental distinction between Slide-tags/Curio Trekker, which donate spatial barcodes by diffusion, and the binding technology claimed in the Asserted Patents.

153.    Moreover, Plaintiffs did not seek to clear under the Protective Order any experts or consultants—who could have analyzed Curio's documents and arrived at the same conclusions as to Curio Trekker's operation as Dr. Ståhl—before serving their Initial Infringement Contentions. On information and belief, nor did they consult with their advisor and collaborator Dr. Ståhl to analyze whether there was an objective basis to read the Asserted Patents—which require "specific binding" between a "binding agent" and a "target nucleic acid"—onto Curio Trekker. Had they done so, they would have confirmed that there was no reasonable basis to accuse Curio Trekker, because as elaborated above, Curio Trekker's mode of operation does not involve a binding interaction at all, let alone the "specific binding" required by the Asserted Patents.

154.    Undeterred by these inconvenient truths and under the guise of having insufficient information to determine how Curio Trekker operated, Plaintiffs asserted infringement anyway.

On information and belief, Plaintiffs accused Curio Trekker of infringement for purposes unrelated to the merits of the claim. Instead, Plaintiffs' intent was to harm Curio by requiring it to disclose to actual and potential investors and customers that Curio Trekker was also implicated by this sham litigation, and thus interfere with such business relationships.

      D.      **The Spatial Transcriptomics Market**

155.    The relevant product market at issue in this case is consumable kits for conducting Next Generation Sequencing-based spatial transcriptome mapping sold to academic research institutions, hospitals, pharmaceutical and biotechnology companies, and other similarly-situated businesses. As explained in Chen et al., "Spatial Transcriptomic Technologies," Cells, 2023 Aug; 12(16):2042,[10] 10x's Visium, as well as Slide-Seq, a technique of which Curio's Seeker is a commercialized version, are sequencing-based spatial transcriptomics methods. Products offered within the NGS-based spatial transcriptome mapping market are not reasonably interchangeable with products outside this market. The products in the NGS-based spatial transcriptome mapping market have differing features and functionalities relative to other RNA analysis products.

---

[10] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10453065/ ("Chen").



Figure 1

Four main types of spatial transcriptomic methods. Sequencing-based methods (method (**A**)) use barcoded DNA arrays to capture polyadenylated RNA transcripts from tissues followed by next-generation sequencing. Probe-based methods (method (**B**)) capture user-defined targeted transcripts in manually selected regions of interest (ROIs), using corresponding, barcoded oligonucleotide-conjugated probes and can be demultiplexed accordingly afterwards. Imaging-based methods (method (**C**)), similar to probe-based methods, rely on in situ hybridization but with complimentary fluorescent probes, and the targeted transcripts can be detected in a cyclic manner. Image-guided spatially resolved scRNAseq methods (method (**D**)) can select spatially different single cells in ROIs (i.e. photoactivation of single cells in ROIs) followed by fluorescence-activated cell sorting and scRNAseq, thereby preserving their native spatial information as well as retaining in-depth profiling of scRNAseq.

156.    The relevant geographic market is the United States. Curio sells and has sold its Seeker product in interstate commerce throughout the United States. On information and belief, 10x sells and has sold its Visium product line in interstate commerce throughout the United States.

157.    On information and belief, 10x's Visium product is in a dominant market position, with a dominant market share estimated over 50%. As observed in a recent publication,[11] Visium is by far the most widely-used product based on "the number of institutions that have published papers or preprints" with various spatial transcriptomics techniques, with the breadth of its usage far outpacing all other techniques (NGS-based and otherwise).



158.    There are significant barriers to entry in the market for NGS-based spatial transcriptome mapping that serve to protect and preserve 10x's market power. Such barriers include high startup costs in research and development, lack of manufacturing capability or infrastructure, lack of established distribution channels, businesses unwillingness to invest in expensive systems that are incompatible with others, as well as Plaintiffs' use of sham litigation solely in order to eliminate Curio and other competitors from the relevant market.

**E.    The Subjective Purpose of this Lawsuit is to Harm Curio; Not to Succeed on the Merits**

159.    On information and belief, Plaintiffs are indifferent to the outcome on the merits of the infringement suit. Moreover, to the extent there are any compensable damages for infringement, they would be too low to justify the 10x's investment in the suit. 10x has three full-

---

[11] Moses and Pachter, "Museum of Spatial Transcriptomics," Nature Methods Vol. 19, May 2022 at 534-546.

time in-house legal counsel responsible for overseeing this matter, and has already entered appearances by 11 attorneys from two major law firms. The fees and expenses it is incurring to litigate this sham action greatly exceed any recovery it could expect as a result of this case.

160.    On information and belief, for the year ending in December 2023, 10x reported an **increase** in year-over-year outside counsel fees **of $18 million**. 10x 2023 Annual Report at 85. On information and belief, such legal fees are a primary driver of 10x's 2023 spend of $343 million on "selling, general, and administrative" expenses. *Id.* On information and belief, the reason for this increase was because the prosecution of anticompetitive sham actions has become a core part of 10x's business. Indeed, such expenses exceeded 10x's "Research and development" spend in 2023 by $73 million. *Id.* Even the **increase** in 10x's outside counsel spend exceeds Curio's revenue for the accused products by many fold.

161.    On information and belief, 10x and Prognosys did not bring this case for purposes of redressing a legally compensable injury; instead, the Complaint was filed primarily for the benefit of collateral injuries inflicted on Curio through the use of legal process. Specifically, 10x intended for the cloud of the lawsuit to interfere with Curio's ability to secure funding and sell its products to customers.

162.    On information and belief, 10x's strategy before the Unified Patent Court in Europe ("UPC") against NanoString is illustrative of the nature of 10x's anticompetitive campaign. 10x successfully convinced the UPC to issue a preliminary injunction against NanoString regarding the use of the CosMx Spatial Molecular Imager—a preliminary injunction that has since been reversed. Shortly after 10x's anticompetitive injunction was issued, 10x salespeople in the field began advertising to customers that CosMx was no longer a valid research tool in the countries within the scope of the UPC's ruling, and offered substantial discounts to customers willing to

destroy their CosMx platform (and provide proof to 10x). Academic scientists working on cutting edge science using the CosMx were forced to cease and desist their medical research.

163.    On information and belief, 10x personnel used these events, Nanostring's Chapter 11 Bankruptcy filing, as well as the filing of this sham litigation, as an opportunity to tell current and potential Curio customers that Curio would likely suffer a similar fate, whether in the U.S. or elsewhere. These practices dramatically impacted Curio's ability to sell Seeker, as it created substantial fear among potential customers that they would be left without access to the product and workflow shortly after buying them, despite their praiseworthy technical performance.

164.    On information and belief, 10x's UPC litigation strategy against Curio has been similarly indicative of its specific intent to use the litigation process, rather than the merits of litigation, to harm Curio. For example, despite both Curio and 10x being American companies, and despite its corporate representatives at the UPC being General Counsel Eric Whittaker and in-house counsel Randy Wu, American citizens who do not speak German, 10x attempted to force the proceedings to be conducted in German, rather than English. This approach initially succeeded, although it was overturned by the UPC's appellate body. On information and belief, this strategic decision was made in order to decrease Curio's ability to participate and increase its costs, consistent with 10x's overarching goal to achieve attrition through the litigation process, rather than on the basis of meritorious claims.

165.    10x's strategy has succeeded in harming, and continues to harm, Curio. Potential investors have declined to proceed, citing the lawsuit. Moreover, potential customers have, despite praising Curio's technology, declined to purchase products, citing uncertainty that Curio's products may be removed from the market as a result of 10x's sham litigation.

**FIRST COUNTERCLAIM**
**(Conspiracy to Monopolize in Violation of 15 U.S.C. §2)**
(*Against Plaintiffs 10x and Prognosys*)

166.    Curio incorporates by reference the allegations in the above Paragraphs.

167.    Plaintiffs 10x and Prognosys have engaged in an illegal conspiracy to monopolize the emerging market for spatial transcriptomics.

168.    10x and Prognosys had the specific intent to monopolize the emerging market for spatial transcriptomics.

169.    10x and Prognosys have engaged in anticompetitive conduct by raising objectively baseless sham litigation against Curio. This lawsuit is objectively baseless, in that no reasonable litigant could realistically expect success on the merits, given that 10x asserted before the USPTO an understanding of the relevant art that directly contradicts its infringement theory in this case. Its infringement theory is also objectively baseless, in that no reasonable litigant could realistically expect success on the merits, given that 10x and Prognosys know that the Chee patents lack written description support for the claims under the construction necessary for its infringement theory. Moreover, such conduct is directly and immediately related to and affects the matters and claims at issue in this case, has injured and continues to injure Curio, and affects the balance of equities between the parties. Accordingly, the lawsuit is objectively baseless due to Curio's robust defenses, and it conceals 10x and Prognosys's attempt to eliminate competition and interfere directly with the business relationships of Curio in the market for spatial transcriptomics.

170.    Even if this Court were to find that 10x and Prognosys's litigation is somehow not baseless, as the court recognized in *Bio-Rad Laboratories, Inc. v. 10x Genomics, Inc.*, 483 F.Supp.3d 38, 55 (D. Mass. 2020), "the institution of [litigation] against the Sherman Act plaintiff...could furnish the source of the antitrust injury... even if it could not provide a basis for a Sherman Act violation under the *Noerr-Pennington* doctrine."   As described above, 10x's

scheme—including its strategic patent prosecution, and strategic patent acquisition—collectively constitutes an independent antitrust harm. This litigation is intended to give further effect to that improper scheme, and Curio is injured in having to defend against it.

171.    10x has a dangerous probability of success in monopolizing the spatial transcriptomics market. Through this lawsuit and others, 10x is seeking to eliminate all viable rivals to its Visium line of spatial transcriptomics products.

172.    The Plaintiffs' conduct has had an anticompetitive effect in the spatial transcriptomics market.

173.    The Plaintiffs' conduct has no legitimate business purpose or procompetitive effect but is instead designed to yield a monopoly in the spatial transcriptomics market.

174.    The Plaintiffs' conduct has had a substantial effect on interstate commerce.

175.    Curio has been or will be injured in its business and property as a result of the conduct, as there is an imminent threat to Curio's primary commercial offering, Seeker.

176.    The Plaintiffs' conduct has also caused market-wide antitrust injury, as the Plaintiffs seek to eliminate *all competitors* in the relevant market and grant 10x a monopoly. Once Plaintiffs' scheme is fully implemented, consumers in the spatial transcriptomics market will be forced to pay supracompetitive prices to 10x and Prognosys.

## SECOND COUNTERCLAIM
### (Attempted Monopolization in Violation of 15 U.S.C. §2)
#### (*Against Plaintiff 10x*)

177.    Curio incorporates by reference the allegations in the above paragraphs.

178.    Plaintiff 10x is attempting to monopolize the emerging market for spatial transcriptomics. 10x has the specific intent to monopolize this market.

179.    10x has engaged in anticompetitive conduct by raising objectively baseless sham litigation against Curio. This lawsuit is objectively baseless, in that no reasonable litigant could

11328928

- 41 -

realistically expect success on the merits, given that 10x asserted before the USPTO an understanding of the relevant art that directly contradicts its infringement theory in this case. Its infringement theory is also objectively baseless, in that no reasonable litigant could realistically expect success on the merits, given that 10x knows that the Chee patents lack written description support for the claims under the construction necessary for its infringement theory. Moreover, such conduct is directly and immediately related to and affects the matters and claims at issue in this case, has injured and continues to injure Curio, and affects the balance of equities between the parties. Accordingly, the lawsuit is objectively baseless due to Curio's robust defenses, and it conceals 10x's attempt to eliminate competition and interfere directly with the business relationships of Curio in the market for spatial transcriptomics.

180.    Even if this Court were to find that 10x's litigation is somehow not baseless, as the court recognized in *Bio-Rad Laboratories, Inc. v. 10x Genomics, Inc.*, 483 F.Supp.3d 38, 55 (D. Mass. 2020), "the institution of [litigation] against the Sherman Act plaintiff...could furnish the source of the antitrust injury... even if it could not provide a basis for a Sherman Act violation under the *Noerr-Pennington* doctrine." As described above, 10x's scheme—including its strategic patent prosecution, and strategic patent acquisition—collectively constitutes an independent antitrust harm. This litigation is intended to give further effect to that improper scheme, and Curio is injured in having to defend against it.

181.    10x has a dangerous probability of success in monopolizing the spatial transcriptomics market. Through this lawsuit and others, 10x is seeking to eliminate all viable rivals to its Visium line of Spatial Transcriptomics products.

182.    10x's conduct has had an anticompetitive effect in the spatial transcriptomics market.

183.    10x's conduct has no legitimate business purpose or procompetitive effect but is instead designed to yield a monopoly in the spatial transcriptomics market.

184.    10x's conduct has had a substantial effect on interstate commerce.

185.    Curio has been or will be injured in its business and property as a result of the conduct, as there is an imminent threat to Curio's primary commercial offering, Seeker.

186.    10x's conduct has also caused market-wide antitrust injury, as the 10x seeks to eliminate **all competitors** in the relevant market and grant 10x a monopoly. Once 10x's scheme is fully implemented, consumers in the spatial transcriptomics market will be forced to pay supracompetitive prices to 10x.

**THIRD COUNTERCLAIM**
**(Violation of the Cartwright Act, Cal. Bus. & Prof. Cod §§16720 et seq.)**
(*Against Plaintiffs 10x and Prognosys*)

187.    Curio incorporates by reference the allegations in the above Paragraphs.

188.    10x and its co-conspirator Prognsoys's contract, combination, trust or conspiracy was substantially carried out and effectuated within the State of California.

189.    Beginning in at least October 2018 and continuing thereafter at least up to and including May 2024, 10x and Prognosys entered into and engaged in a continuing unlawful trust for the purpose of unreasonably restraining trade in violation of Section 16720 of the California Business and Professions Code.

190.    These violations of Section 16720 of the California Business and Professions Code consisted, without limitation, of continuing unlawful trust and concert of action among 10x and Prognosys, the substantial terms of which were to create and carry out restrictions on commerce in eliminating alternatives to 10x's Visium spatial transcriptomics products, including Curio's Seeker.

191.     For the purpose of forming and effectuating the unlawful trust, 10x and Prognosys conspired to engage in baseless sham litigation against Curio to force it to stop marketing its Seeker product and exit the spatial transcriptomics market.

192.     The combination and conspiracy has had, among other things, the effect of creating fear, uncertainty and doubt surrounding Curio's commercial prospects and viability; discouraged potential purchasers of Curio's Seeker product; and discouraged other competitors from introducing spatial transcriptomics products in California.

193.     As a direct and proximate cause of 10x's violations of Section 16720 of the California Business and Professions Code, Curio has been or will be injured in its business and property as a result of 10x and Prognosys's conduct with California, as there is an imminent threat to Curio's primary commercial offering, Seeker, and Curio may be prevented from marketing Seeker in California. Moreover, natural persons residing in the State of California have been or will be injured in their business and property in that they will be deprived of competition between 10x and other providers (including Curio) of spatial transcriptomics products, and will be forced to pay supracompetitive prices for 10x's Visium product.

### FOURTH COUNTERCLAIM
**(Violation of the Unfair Competition Law, Cal. Bus. & Prof. Cod §§17200 et seq.)**
(*Against 10x and Prognosys*)

194.     Curio incorporates by reference the allegations in the above Paragraphs.

195.     Beginning at least in or around November 2018, and continuing thereafter at least up to and including May 2024, 10x and Prognosys committed acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code.

196.     The acts, omissions, misrepresentations, practices, and non-disclosures of 10x, as alleged herein, constituted unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code,

- 44 -

Sections 17200, *et seq*., including but not limiting to the following violations constituting unlawful

acts within the meaning of California Business and Professions Code, Sections 17200, *et seq*.: (i)

conspiracy to monopolize in violation of 15 U.S.C. §2; (ii) attempted monopolization in violation

of 15 U.S.C. §2; and (iii) the violations of Sections 16720, *et seq*., of the California Business and

Professions Code discussed above.

## FIFTH COUNTERCLAIM
### (Declaratory Judgment of Non-Infringement of the '022 Patent)

197.     Curio realleges and incorporates by reference herein all allegations and responses

contained in the foregoing paragraphs.

198.     An actual controversy has arisen and now exists between the parties concerning

whether Curio has infringed any valid and enforceable claim of the '022 Patent.

199.     Curio has not made, used, sold, offered for sale, or imported into the United States

any devices, products, services, or methods that infringe the '022 Patent, or otherwise infringed

the '022 Patent, either directly or indirectly, contributorily, willfully, literally, or under the doctrine

of equivalents.

200.     Curio seeks a declaratory judgment that it is not directly, indirectly, or

contributorily infringing any valid and enforceable claim of the '022 Patent.

## SIXTH COUNTERCLAIM
### (Declaratory Judgment of Invalidity of the '022 Patent)

201.     Curio realleges and incorporates by reference herein all allegations and responses

contained in the foregoing paragraphs.

202.     An actual controversy has arisen and now exists between the parties concerning

whether the claims of the '022 Patent are valid.

203.     The claims of the '022 Patents are invalid under one or more of 35 U.S.C. §§ 101,

102, 103, 112, and/or 116.

204.     Curio seeks a declaratory judgment that the '022 Patent is invalid under one or more of 35 U.S.C. §§ 101, 102, 103, 112, and/or 116.

### SEVENTH COUNTERCLAIM
### (Declaratory Judgment of Non-Infringement of the '468 Patent)

205.     Curio realleges and incorporates by reference herein all allegations and responses contained in the foregoing paragraphs.

206.     An actual controversy has arisen and now exists between the parties concerning whether Curio has infringed any valid and enforceable claim of the '468 Patent.

207.     Curio has not made, used, sold, offered for sale, or imported into the United States any devices, products, services, or methods that infringe the '468 Patent, or otherwise infringed the '468 Patent, either directly or indirectly, contributorily, willfully, literally, or under the doctrine of equivalents.

208.     Curio seeks a declaratory judgment that it is not directly, indirectly, or contributorily infringing any valid and enforceable claim of the '468 Patent.

### EIGHTH COUNTERCLAIM
### (Declaratory Judgment of Invalidity of the '468 Patent)

209.     Curio realleges and incorporates by reference herein all allegations and responses contained in the foregoing paragraphs.

210.     An actual controversy has arisen and now exists between the parties concerning whether the claims of the '468 Patent are valid.

211.     The claims of the '468 Patents are invalid under one or more of 35 U.S.C. §§ 101, 102, 103, 112, and/or 116.

212.     Curio seeks a declaratory judgment that the '468 Patent is invalid under one or more of 35 U.S.C. §§ 101, 102, 103, 112, and/or 116.

## NINTH COUNTERCLAIM
### (Declaratory Judgment of Non-Infringement of the '879 Patent)

213.    Curio realleges and incorporates by reference herein all allegations and responses contained in the foregoing paragraphs.

214.    An actual controversy has arisen and now exists between the parties concerning whether Curio has infringed any valid and enforceable claim of the '879 Patent.

215.    Curio has not made, used, sold, offered for sale, or imported into the United States any devices, products, services, or methods that infringe the '879 Patent, or otherwise infringed the '879 Patent, either directly or indirectly, contributorily, willfully, literally, or under the doctrine of equivalents.

216.    Curio seeks a declaratory judgment that it is not directly, indirectly, or contributorily infringing any valid and enforceable claim of the '879 Patent.

## TENTH COUNTERCLAIM
### (Declaratory Judgment of Invalidity of the '879 Patent)

217.    Curio realleges and incorporates by reference herein all allegations and responses contained in the foregoing paragraphs.

218.    An actual controversy has arisen and now exists between the parties concerning whether the claims of the '879 Patent are valid.

219.    The claims of the '879 Patents are invalid under one or more of 35 U.S.C. §§ 101, 102, 103, 112, and/or 116.

220.    Curio seeks a declaratory judgment that the '879 Patent is invalid under one or more of 35 U.S.C. §§ 101, 102, 103, 112, and/or 116.

## ELEVENTH COUNTERCLAIM
### (Declaratory Judgment of Non-Infringement of the '138 Patent)

221.    Curio realleges and incorporates by reference herein all allegations and responses contained in the foregoing paragraphs.

222.    An actual controversy has arisen and now exists between the parties concerning whether Curio has infringed any valid and enforceable claim of the '138 Patent.

223.    Curio has not made, used, sold, offered for sale, or imported into the United States any devices, products, services, or methods that infringe the '138 Patent, or otherwise infringed the '138 Patent, either directly or indirectly, contributorily, willfully, literally, or under the doctrine of equivalents.

224.    Curio seeks a declaratory judgment that it is not directly, indirectly, or contributorily infringing any valid and enforceable claim of the '138 Patent.

## TWELTH COUNTERCLAIM
### (Declaratory Judgment of Invalidity of the '138 Patent)

225.    Curio realleges and incorporates by reference herein all allegations and responses contained in the foregoing paragraphs.

226.    An actual controversy has arisen and now exists between the parties concerning whether the claims of the '138 Patent are valid.

227.    The claims of the '138 Patents are invalid under one or more of 35 U.S.C. §§ 101, 102, 103, 112, and/or 116.

228.    Curio seeks a declaratory judgment that the '138 Patent is invalid under one or more of 35 U.S.C. §§ 101, 102, 103, 112, and/or 116.

**THIRTEENTH COUNTERCLAIM**
**(Declaratory Judgment of Non-Infringement of the '030 Patent)**

229.    Curio realleges and incorporates by reference herein all allegations and responses contained in the foregoing paragraphs.

230.    An actual controversy has arisen and now exists between the parties concerning whether Curio has infringed any valid and enforceable claim of the '030 Patent.

231.    Curio has not made, used, sold, offered for sale, or imported into the United States any devices, products, services, or methods that infringe the '030 Patent, or otherwise infringed the '030 Patent, either directly or indirectly, contributorily, willfully, literally, or under the doctrine of equivalents.

232.    Curio seeks a declaratory judgment that it is not directly, indirectly, or contributorily infringing any valid and enforceable claim of the '030 Patent.

**FOURTEENTH COUNTERCLAIM**
**(Declaratory Judgment of Invalidity of the '030 Patent)**

233.    Curio realleges and incorporates by reference herein all allegations and responses contained in the foregoing paragraphs.

234.    An actual controversy has arisen and now exists between the parties concerning whether the claims of the '030 Patent are valid.

235.    The claims of the '030 Patents are invalid under one or more of 35 U.S.C. §§ 101, 102, 103, 112, and/or 116.

236.    Curio seeks a declaratory judgment that the '030 Patent is invalid under one or more of 35 U.S.C. §§ 101, 102, 103, 112, and/or 116.

**PRAYER FOR RELIEF ON CURIOS' COUNTERCLAIMS**

WHEREFORE, Curio respectfully prays for the following relief:

A. That the court enter judgment in favor of Curio in all respects, including all legal and equitable relief, including all available measures of damages in favor of Defendant Curio against Plaintiffs 10x and Prognosys for all damages sustained as a result of 10x and Prognosys's wrongdoing, in an amount to be proven at trial, including pre and post judgment interest thereon;

B. An award of treble damages against Plaintiffs 10x and Prognosys for their intentional, willful, and knowing violations of the Sherman Act;

C. An award of treble damages against Plaintiffs 10x and Prognosys for their intentional, willful, and knowing acts in violation of the Cartwright Act;

D. For a declaration that Curio has not infringed, induced others to infringe, or contributed to the infringement of any claims of the Patents-in-Suit;

E. For injunctive relief prohibiting Plaintiffs 10X and Prognosys from continuing to engage in the acts of unfair competition under Cal. Bus. & Prof. Cod §§17200 et seq. alleged above.

F. For a declaration that the Patents-in-Suit are invalid;

G. That Plaintiffs' Complaint be dismissed with prejudice, and that Plaintiffs take nothing as a result of the Complaint;

H. For a determination that this is an exceptional case under 35 U.S.C. § 285, and an award of attorneys' fees and costs to Curio in this action; and

I. For such other relief as the Court deems just and equitable.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Curio respectfully demands a trial by jury on all issues so triable.

Dated: June 20, 2024

*Of Counsel:*

Morgan Chu
Alan Heinrich
Andrew Krause
Abigail Sellers
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel: (310) 277-1010
Fax: (310) 203-7199
mchu@irell.com
aheinrich@irell.com
akrause@irell.com
asellers@irell.com

Kevin Collins
Andrew Lazerow
Matthew Kudzin
Paul Enríquez
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4956
Tel: (202) 662-6000
kcollins@cov.com
alazerow@cov.com
mkudzin@cov.com
penriquez@cov.com

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Str., 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Defendant Curio Bioscience Inc.*