**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| 10x GENOMICS, INC and PROGNOSYS BIOSCIENCES, INC., | ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    Civil Action No. 23-1375-MN |
| | ) |
| CURIO BIOSCIENCES, INC., | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

In this patent infringement action filed by Plaintiffs 10x Genomics, Inc. ("10x") and

Prognosys Biosciences, Inc. ("Prognosys" and collectively with 10x, "Plaintiffs") against

Defendant Curio Biosciences, Inc. ("Curio" or "Defendant"), Defendant has asserted various

counterclaims against Plaintiffs.  Presently before the Court is Plaintiffs' motion to dismiss

Defendant's First through Fourth Counterclaims, filed pursuant to Federal Rule of Civil

Procedure 12(b)(6) ("Motion").  (D.I. 51)[1]  For the reasons set forth below, the Court

recommends that Plaintiffs' Motion be GRANTED-IN-PART and DENIED-IN-PART.

## I.    BACKGROUND

### A.    Factual Background

10x and Prognosys are biological research companies that specialize in spatial

transcriptomics, which is the study of RNA molecules in a cell and the distinct locations of those

molecules within the tissue.  (D.I. 1 at ¶ 9; D.I. 49 at ¶ 9)  Prognosys owns a family of patents for

---

[1]    With regard to the counterclaims at issue in this case, Curio is of course a Counterclaim-Plaintiff.  But since it is the Defendant as to 10x's and Prognosys' patent infringement claims that were first-filed in the case, the Court herein will refer to Curio as "Defendant" and 10x and Prognosys as "Plaintiffs."

"Spatially Encoded Biological Assays" invented by its former CEO and CSO Mark S. Chee, Ph.D. (the "Chee patents"). (D.I. 1 at ¶ 14; *see id*. at ¶ 23) 10x is the exclusive licensee of the Chee patents, and it also owns and licenses a variety of other intellectual property in the field of spatial transcriptomics. (*Id*. at ¶¶ 10, 14; *see also* D.I. 49 at ¶ 112) 10x describes its intellectual property portfolio as "foundational . . . for performing spatial transcriptomics" and "developed by the scientists who pioneered the techniques underpinning it." (D.I. 1 at ¶ 14) In 2019, after acquiring Spatial Transcriptomics AB, 10x launched its Visium Platform with the Visium Spatial Gene Expression Solution—a commercial product that preserves spatial information through the use of spatially-barcoded capture probes at known locations. (*Id*. at ¶¶ 10-11)

Defendant Curio is an early-stage biotechnology company aimed at "providing accessible research tools to the life sciences industry." (D.I. 49 at ¶ 92) In February 2023, Defendant announced the launch of its Curio Seeker Kit ("Seeker Kit" or "Seeker product"), which would compete with 10x's Visium product line. (D.I. 1 at ¶ 18) Defendant's Seeker Kit allows spatial mapping of an entire transcriptome of fresh-frozen tissues, such that users can capture and spatially index mRNA and prepare a sequencing library. (D.I. 49 at ¶¶ 93-94; *see* D.I. 1 at ¶¶ 19-21)

Additional facts relevant to resolution of the instant Motion will be discussed in Section III.

**B.    Procedural Background Regarding This and Other Litigation**

In 2022, Plaintiffs brought patent infringement suits in this District against competing companies, including suits filed against Vizgen, Inc. ("Vizgen"), NanoString Technologies, Inc. ("NanoString") and Parse Biosciences, Inc. ("Parse"). (D.I. 49 at ¶¶ 101-02) In the NanoString case, a jury found that the defendant infringed seven Prognosys patents that are related to the

asserted patents here and found that those patents were valid; the jury awarded Plaintiffs over $31 million in damages.  (D.I. 1 at ¶ 16)  As a result of Plaintiffs' litigation against NanoString, NanoString filed for Chapter 11 bankruptcy protection.  (D.I. 49 at ¶¶ 101, 163)

Then on December 1, 2023, Plaintiffs filed the instant suit against Defendant.  Plaintiffs' Complaint alleges that Defendant's Curio Seeker Kit (and associated products, components and services) infringes five of the Chee patents relating to spatially encoded biological assays.  (D.I. 1 at ¶¶ 23-24)  Plaintiffs later amended their identification of accused products in the case to also include the Curio Trekker product ("Trekker product"), which Defendant began commercializing in 2024.  (D.I. 49 at ¶ 141; *see* D.I. 52 at 13)

On June 20, 2024, Defendant filed its Answer and First Amended Counterclaims ("Answer").  (D.I. 49)  Defendant asserts 14 Counterclaims against Plaintiffs; the first four (collectively, the "Antitrust Counterclaims") are at issue here.  (*Id.*)  The Antitrust Counterclaims are as follows:

- First Counterclaim:  Conspiracy to Monopolize in Violation of 15 U.S.C. § 2 (against 10x and Prognosys), (*id.* at ¶¶ 166-76);

- Second Counterclaim:  Attempted Monopolization in Violation of 15 U.S.C. § 2 (against 10x), (*id.* at ¶¶ 177-86);

- Third Counterclaim:  Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 et seq. (against 10x and Prognosys), (*id.* at ¶¶ 187-93);

- Fourth Counterclaim:  Violation of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq. (against 10x and Prognosys), (*id.* at ¶¶ 194-96).

Plaintiffs filed the instant Motion on July 5, 2024.  (D.I. 51)  The Motion was fully briefed as of August 23, 2024.  (D.I. 64)  On September 5, 2024, the Motion was referred to the Court for resolution by United States District Judge Maryellen Noreika.  (D.I. 69)

3

## II.    STANDARD OF REVIEW

When presented with a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court conducts a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the court separates the factual and legal elements of a claim, accepting all of the pleading's well-pleaded facts as true, but disregarding any legal conclusions. *Id.* at 210-11. Second, the court determines whether the facts alleged are sufficient to show that the plaintiff has a "plausible claim for relief." *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In assessing the plausibility of a claim, the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler*, 578 F.3d at 210 (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)) (internal quotation marks omitted); *see also Barrier1 Sys., Inc. v. RSA Protective Techs., LLC*, C.A. No. 20-340 (MN), C.A. No. 20-1121 (MN), 2021 WL 4622545, at *1 (D. Del. Oct. 7, 2021) (noting that the above standard applies to a motion to dismiss not only claims in a complaint, but also counterclaims).

## III.    DISCUSSION

With their Motion, Plaintiffs make numerous arguments as to why each of Defendant's Antitrust Counterclaims should be dismissed under Rule 12(b)(6). The Court will address Plaintiffs' arguments on a counterclaim-by-counterclaim basis.

### A.    First Counterclaim

In the First Counterclaim, Defendant asserts that 10x and Prognosys have "engaged in an illegal conspiracy to monopolize the emerging market for spatial transcriptomics" in violation of 15 U.S.C. § 2 ("Section 2") of the Sherman Act.  (D.I. 49 at ¶ 167)  Pursuant to Section 2, it is unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States[.]" 15 U.S.C. § 2.  "A Section 2 conspiracy claim has four elements: (1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged." *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010); *see also W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010).

Plaintiffs make various arguments as to why the First Counterclaim must be dismissed. More specifically, they argue that:  (1) the First Counterclaim fails to sufficiently allege a viable agreement or conspiracy to monopolize; (2) it fails to sufficiently allege anticompetitive conduct; and (3) Defendant has pleaded harm to itself, rather than the required harm to competition. Below the Court need only address the first of these arguments, which is sufficient on its own to warrant grant of the Motion as to the First Counterclaim.

With this argument, Plaintiffs assert that the First Counterclaim must be dismissed because Defendant's Answer fails to allege an illegal agreement (or a "conspiracy" or "concerted action").  (D.I. 52 at 8-9; D.I. 64 at 1-4); *see also W. Penn*, 627 F.3d at 99.  To sufficiently plead an unlawful agreement to monopolize, the claimant has to plead "an agreement between two or more persons or entities[.]" *Howard Hess*, 602 F.3d at 254; *see Cole's Wexford Hotel, Inc. v. UPMC*, 127 F. Supp. 3d 387, 414 (W.D. Pa. 2015).  And to set out the relevant agreement, the plaintiff "must allege facts plausibly suggesting a 'unity of purpose or common design and

understanding, or a meeting of the minds in an unlawful arrangement.'" *Howard Hess*, 602 F.3d at 254 (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984)); *see also W. Penn*, 627 F.3d at 99; *Wallach v. Eaton Corp.*, 814 F. Supp. 2d 428, 440 (D. Del. 2011). A claimant may rely on direct or circumstantial evidence to demonstrate the existence of an agreement. *W. Penn*, 627 F.3d at 99; *see Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 333 (3d Cir. 2018).

Plaintiffs articulate two reasons as to why Defendant has not sufficiently pleaded an illegal agreement. Below, the Court will take up the first of those reasons, as it is what leads to the Court's recommendation that this counterclaim should be dismissed.[2]

Plaintiffs assert that the counterclaim improperly alleges a conspiracy between Prognosys and 10x—a patentee and exclusive licensee, respectively. Plaintiffs argue that a patentee and exclusive licensee are often treated as a single economic entity pursuant to antitrust law, and if they are viewed that way, then the two companies are incapable of forming the requisite agreement. (D.I. 52 at 8)

As a general matter, separately controlled legal entities like Plaintiffs are typically understood to have their own distinct interests and thus to be capable of taking concerted action. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010). But this is not always so.

---

[2]    Plaintiffs' second reason for dismissal is that Defendant "has failed to allege the existence of an agreement to do anything unlawful." (D.I. 52 at 8) Although the Court need not reach this issue here, it notes that: (1) an agreement to do something unlawful essentially amounts to an agreement to engage in anticompetitive conduct, which can take a variety of forms, *see LePage's Inc. v. 3M*, 324 F.3d 141, 152 (3d Cir. 2003); and (2) a sham patent infringement litigation may, if it is sufficiently pleaded, amount to unlawful anticompetitive conduct, *see Rochester Drug Co-op., Inc. v. Braintree Lab'ys*, 712 F. Supp. 2d 308, 316 (D. Del. 2010); *In re Wellbutrin XL Antitrust Litig.*, Civil Action No. 08-2431 (direct), 2009 WL 678631, at *5 (E.D. Pa. Mar. 13, 2009).

The relevant question is not "whether the defendant is a legally single entity or has a single name" nor whether "parties involved 'seem' like one firm or multiple firms in any metaphysical sense." *Id.*  Instead, under the relevant legal doctrine (known as the "*Copperweld* doctrine"), the key question is whether the entities alleged to have conspired, under the circumstances at issue, amount to "separate decisionmakers" that are "'separate economic actors pursuing separate economic interests,' . . . such that the agreement 'deprives the marketplace of independent centers of decisionmaking[.]'"  *Id.* (quoting *Copperweld*, 467 U.S. at 769); *see also In re Suboxone Antitrust Litig.*, 622 F. Supp. 3d 22, 83-85 (E.D. Pa. 2022).

In the First Counterclaim, Curio alleges that 10x and Prognosys engaged in the requisite conspiracy "by raising objectively baseless sham [patent] litigation [in this case] against Curio." (D.I. 49 at ¶ 169)  And it is clear from the Answer that the nature of any working arrangement or agreement between 10x and Prognosys in that regard directly relates to the fact that both parties have a legal interest in the asserted patents—i.e., Prognosys as the patentee and 10x as the exclusive licensee.  (*Id.* at ¶¶ 110, 114)

Now, just because two alleged conspirators are a patentee and an exclusive licensee, respectively, that does not mean that they are always viewed as a "single economic entity" for purposes of a Sherman Act conspiracy claim.  *See, e.g.*, *10x Genomics, Inc. v. Vizgen, Inc.*, 681 F. Supp. 3d 252, 266 (D. Del. 2023) ("*Vizgen*"); *Townshend v. Rockwell Int'l Corp.*, No. C99-0400SBA, 2000 WL 433505, at *6 (N.D. Cal. Mar. 28, 2000); *Levi Case Co., Inc. v. ATS Prods., Inc.*, 788 F. Supp. 428, 431 (N.D. Cal. 1992).  But a number of courts have concluded that there are some circumstances in which a patent holder and an exclusive licensee cannot be viewed as anything other than a single economic entity for such purposes.  In that regard, these courts have noted that when a patentee grants an exclusive license, the license can at times "exclude[] even

the patent holder himself from exercising the rights conveyed by the license." *Levi Case*, 788 F. Supp. at 431.  They have also explained that, as a general matter, patent law requires that any patentee must be joined (either voluntarily or involuntarily) in any patent infringement suit that is brought by an exclusive licensee. *See Duke Univ. v. Akorn, Inc.*, Case No. 3:18-cv-14035-BRM-TJB, 2019 WL 4410284, at *11 (D.N.J. Sept. 16, 2019); *Shionogi Pharma, Inc. v. Mylan, Inc.*, Civil Action No. 10-1077, 2011 WL 2174499, at *5 (D. Del. May 26, 2011).  In light of these realities, courts have suggested that if an alleged sham patent litigation is prosecuted by a patentee and exclusive licensee, and if the circumstances of the patentee/licensee relationship are such that the licensee seems to have driven the decision to litigate—with the patentee having little participation and/or say in the matter due to the nature of the patentee/licensee relationship—then any allegations of an antitrust conspiracy between the two entities will not have sufficiently described how they amount to separate economic actors pursuing separate economic interests. *See, e.g., Duke Univ.*, 2019 WL 4410284, at *11; *Shionogi Pharma, Inc.*, 2011 WL 2174499, at *5; *Levi Case*, 788 F. Supp. at 432.

On the other hand, courts have found that a patentee and exclusive licensee allegedly engaging in sham patent litigation *can* amount to two separate economic actors pursuing separate economic interests—so long as there are at least some allegations explaining *why* this is so.  For example, an antitrust claimant has been able to withstand a motion to dismiss in this circumstance where its pleading articulated why the patentee and exclusive licensee had "independent motivations" to unlawfully expand the market power conferred by the patents, *see Townshend*, 2000 WL 433505, at *6 & n.2, or how allegations regarding the two parties' different economic roles (e.g., one as a competitor in the market for products incorporating the patented technology, the other as a pure licensor) helped show why they had "separate [or

different] economic interests" in the outcome of the conspiracy, *Vizgen, Inc.*, 681 F. Supp. 3d at 266. *See also In re: EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1298-99, 1301-02 (D. Kan. 2018); *In re Suboxone Antitrust Litig.*, 13-MD-2445, 2017 WL 4910673, at *8 (E.D. Pa. Oct. 30, 2017).

With this caselaw in mind, the Court turns back to the merits of Plaintiffs' position. And the difficulty here for Defendant is that in its Answer, its allegations regarding the sham litigation at issue do not really portray Prognosys as a separate, independent economic actor with separate economic interests (as compared to 10x). Instead, in fairly clear, consistent and evocative terms, the Answer depicts this litigation—and the overall alleged misuse of the Chee patents—as being *driven* by 10x—with Prognosys' role described as being little more than a required participant. (D.I. 64 at 1 (Plaintiffs asserting that the Motion should be granted on this ground because Defendant has alleged nothing more than the Plaintiffs are a "patentee and exclusive licensee[] that must be joined in an infringement suit brought by the licensee"))

For example, the Answer repeatedly and consistently frames the instant lawsuit as having been brought by "10x" and as being fueled by "10x"'s decisions, plans and overall anti-competitive scheme. (D.I. 49 at ¶ 101 ("This case is one of a larger collection of lawsuits brought by 10x and its co-conspirators . . . . 10x has instituted baseless litigation . . . . 10x is attempting to use acquisitions, patent aggregation, and objectively baseless litigation to obtain monopoly power . . . ."); *id.* at ¶ 102 ("10x has a history of using litigation against early-stage prospective rivals . . . ."); *id.* at ¶ 103 ("10x set its sight on Curio"); *id.* at ¶ 104 ("10x's pattern of baseless sham litigation"); *id.* at ¶ 106 ("this lawsuit is one of the latest components in 10x's anti-competitive scheme"); *id.* at ¶ 128 ("10x filed this lawsuit")) Similarly, the Answer repeatedly describes the alleged sham infringement theories being pressed in the case as "10x's

9

infringement theor[ies.]" (*Id*. at ¶¶ 123, 124)  In contrast, Prognosys is hardly mentioned in a substantive, descriptive way in the relevant pleading.  When it is referenced, Defendant tends to simply note that Prognosys "licens[ed its] patents" to 10x, or makes only conclusory-sounding references to how Prognosys has acted "in concert with" 10x.  (*Id*. at ¶¶ 107, 110)  Indeed, Defendant goes on to allege that when it comes to the Chee patents, "10x *took over control* of prosecution of" those patents after the exclusive license was granted in October 2018 (with Prognosys still required to participate by law in certain formal actions, such as "signing [] necessary oaths and/or declarations" required by the United States Patent and Trademark Office ("PTO")).  (*Id*. at ¶ 114 (emphasis added); *see also id*. at ¶ 115 ("10x began strategically prosecuting the Chee patents"); *id.* at ¶ 121 ("10x took over prosecution" of the Chee patents); *id*. at ¶ 122 ("10x has prosecuted numerous continuation applications in this same manner"))[3]

Perhaps most telling, in its answering brief, when it came time to sum up and explain how it *had* sufficiently alleged a conspiracy in this regard, Defendant seemingly had little to say. In its concluding paragraph, after having acknowledged the relevant caselaw on this question, Defendant only baldly asserted that it had "alleged sufficient facts that Plaintiffs, *as independent decision-makers*, conspired to initiate sham litigation in order to obtain a monopoly and profit from it." (D.I. 62 at 7 (emphasis added))  But in support of that assertion (i.e., of how it had

---

[3]      Even when the Answer makes reference to how 10x itself describes its infringement allegations in the Complaint, the Answer asserts that therein, 10x refers to "Prognosys and Dr. Chee" as "an afterthought" relative to 10x's business.  (D.I. 49 at ¶¶ 108-10 (quoting D.I. 1 at ¶ 14))  Indeed, the Complaint contains minimal information about Prognosys, whose involvement in this lawsuit is therein described simply in terms of its role as a patent owner.  (D.I. 1 at ¶ 14; *see also id*. at ¶¶ 37, 47, 57, 67)  So the Complaint too suggests that 10x is controlling this litigation, with Prognosys participating simply because it is the patentee.  (D.I. 1 at ¶ 15 (explaining how "10x became aware of Curio's infringing activities" and 10x sent Curio a letter advising it of the patents "seeking to ensure that it would not infringe on 10x's patent rights"))

pleaded facts specifically showing how 10x and Prognosys are "independent decision[m]akers"), Defendant cited to nothing—that is, not to one paragraph of its Answer. (*Id*. at 6-7) This only underscored for the Court that its conclusion here (regarding the insufficient pleading of an actionable conspiracy) is the correct one.

So for these reasons, the Court recommends that the Motion be granted as to the First Counterclaim, on the ground that the Answer does not sufficiently plead the existence of an actionable agreement between 10x and Prognosys. That said, it seems possible that Plaintiff might be able to remedy this deficiency by way of the filing of a further amended complaint—particularly one that speaks more to the nature of 10x's and Prognosys' economic interests regarding the assertion of the patents-in-suit (and how they may be said to differ, if they do). In light of this, and in light of Federal Rule of Civil Procedure 15's admonition that leave to amend should be freely permitted "when justice so requires[,]" Fed. R. Civ. P. 15(a)(2), the Court will recommend that dismissal of the First Counterclaim be without prejudice.

### B.    Second Counterclaim

Next, the Court turns to the Second Counterclaim, which alleges attempted monopolization against 10x alone. (D.I. 49 at ¶¶ 177-86) Pursuant to Section 2 of the Sherman Act, it is unlawful for one to monopolize or attempt to monopolize interstate or international commerce. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306 (3d Cir. 2007). To state a Section 2 claim for attempted monopolization, the claimant must allege: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Id*. at 317 (internal quotation marks and citation omitted).

11

Plaintiffs argue that Defendant's attempted monopolization claim fails for two reasons: (1) Defendant fails to sufficiently allege that 10x engaged in anticompetitive conduct; and (2) Defendant fails to sufficiently allege a dangerous probability of achieving monopoly power. (D.I. 52 at 17-19)  The Court will take up both of these arguments in turn.

### 1.     Anticompetitive Conduct

Plaintiffs first argument is that the Second Counterclaim must fail since Defendant has not sufficiently alleged anticompetitive conduct.  (D.I. 52 at 9-16, 17-18; D.I. 64 at 4-7)[4] Plaintiffs say this is so because their patent infringement claims against Defendant are constitutionally protected pursuant to the First Amendment to the United States Constitution (and the associated *Noerr-Pennington* doctrine).  (D.I. 52 at 9-16, 17-18; D.I. 64 at 4-7)

"Anticompetitive conduct . . . is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits."  *Broadcom*, 501 F.3d at 308; *see also 3Shape Trios A/S v. Align Tech., Inc.*, C.A. No. 18-1332-LPS, 2019 WL 3824209, at *4 (D. Del. Aug. 15, 2019).  This includes conduct that "harm[s] the competitive process" by way of "impair[ing] the opportunities of rivals" either in an unnecessarily restrictive way or without furthering competition on the merits.  *Rochester Drug Co-op., Inc. v. Braintree Lab'ys*, 712 F. Supp. 2d 308, 316 (D. Del. 2010); *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 & n.32 (1985).

A patent, however, "is an exception to the general rule against monopolies and the right to access the free and open market."  *King Drug Co. of Florence v. Smithkline Beecham Corp.*,

---

[4]     Plaintiffs' position regarding the lack of plausible allegations as to anticompetitive conduct was also relevant to its arguments regarding the First Counterclaim. Because the Court has recommended grant of the Motion as to that counterclaim on other grounds, it analyzes this argument here, as it relates to the Second Counterclaim.

791 F.3d 388, 394 (3d Cir. 2015) (internal quotation marks and citations omitted); *see also*

*3Shape Trios*, 2019 WL 3824209, at *5.  And because the *Noerr-Pennington* doctrine immunizes

from antitrust liability "[t]hose who petition the government for redress[,]" *Pro. Real Est. Invs.,*

*Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993) ("*PRE*"), "the institution of patent

infringement litigation generally cannot violate antitrust laws" unless one of two narrow

exceptions apply, *3Shape Trios*, 2019 WL 3824209, at *5.

      One of those exceptions is that a party may be held liable for anticompetitive conduct that

takes the form of a sham petition, such as the filing of sham patent litigation.  *PRE*, 508 U.S. at

60-61; *3Shape Trios*, 2019 WL 3824209, at *6; *cf. Sage Chem., Inc. v. Supernus Pharms., Inc.*,

Civil Action No. 22-1302-CJB, 2024 WL 2260331, at *24 (D. Del. May 9, 2024).  This

exception applies where the petitioning at issue is "a mere sham to cover what is actually nothing

more than an attempt to interfere directly with the business relationships of a competitor[.]"  *E.*

*R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961); *see also Sage*

*Chem.*, 2024 WL 2260331, at *24.

      In deciding whether the sham exception applies, courts apply one of two standards—

depending on whether there is a single suit or legal proceeding, or multiple suits/proceedings.

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 179-80 (3d Cir. 2015);

*Sage Chem.*, 2024 WL 2260331, at *24.  Here, the parties have utilized the two-part test that

typically applies when there is only one alleged sham litigation.  (D.I. 52 at 9; D.I. 62 at 7)  And

so the Court will do the same here.  *See Sage Chem.*, 2024 WL 2260331, at *25.

      This test requires first a showing that the lawsuit is "objectively baseless in the sense that

no reasonable litigant could realistically expect success on the merits."  *PRE*, 508 U.S. at 60.  "If

an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable

outcome, then the suit does not qualify as sham litigation and is immunized under [the *Noerr-Pennington* doctrine] and the antitrust claim premised on the sham exception must fail." *Id.* Under the second part of the test, the court focuses on the patent litigant's subjective motivation, and assesses whether "the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor . . . through the use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *Id.* at 60-61 (internal quotation marks and citation omitted) (emphasis in original).

With the relevant test articulated, the Court next turns the first element of that test: i.e., whether Defendant has sufficiently pleaded that 10x's instant patent infringement lawsuit is objectively baseless—such that no reasonable litigant could realistically expect success on the merits. (D.I. 52 at 9-15)  For the reasons set forth below, the Court concludes that Defendant's allegations on that score suffice.

As Defendant notes in its answering brief, (D.I. 62 at 8-12), in its Answer, it asserted (in some detail) that 10x's infringement claims were objectively basis for at least the following three reasons:

- First, Defendant pleads that 10x's claims clearly lack sufficient written description support in the specification.  More specifically, Defendant alleges that in a prior proceeding before the PTO involving the parent application of one of the asserted patents here, 10x attempted to claim a "plurality of encoded probes compris[ing] the *same* biological target-binding agent[.]"  (D.I. 49 at ¶ 132 (emphasis added))  But the Examiner pushed back, repeatedly explaining to 10x that the patents' specification disclosed using *different* binding agents, not the *same* one.  (*Id.* at ¶¶ 136-37)  Defendant alleges that 10x allowed the Examiner's rejection of the proposed claims on this basis to go abandoned, essentially acknowledging its merit.  (*Id.* at ¶ 139)  Yet it asserts that 10x is nevertheless pursuing this litigation, in which it is "stretching the bounds of other patents" by arguing that their similar claim language covers probes comprising the same biological target-binding

14

agent (when in fact 10x knows that the patents do not disclose this).  (*Id*. at ¶ 140; *see also* D.I. 62 at 9)

- Second, Defendant pleads that 10x takes positions in this case regarding its patent infringement allegations that are irreconcilable with positions it took in two prior *inter partes* review ("IPR") proceedings involving Parse, in which other similar patents were at issue.  More specifically, Defendant alleges that in this case, central to 10x's infringement theory is the argument that Defendant's Curio Seeker product contains poly-dT capture agents that "specifically bind[]" to the poly-A tail present on all mRNA molecules.  (D.I. 49 at ¶¶ 123, 128) But Defendant asserts that its Curio Seeker product actually includes poly-dT capture agents that generically bind to *any* mRNA molecule through their poly-A tails (and thus, do not "specifically bind" in the manner called for by the patents). (*Id.* at ¶ 123)  And Defendant asserts that 10x's infringement position here cannot be squared with its assertions in the two Parse IPR proceedings, because in those proceedings, 10x attempted to preserve the validity of a similar patent by arguing that base-pairing interactions between the poly-A tail of mRNA and a poly-dT capture agent are *not* specific.  (*Id.* at ¶ 124)

- Third, Defendant pleads that 10x's allegations of infringement as to the Curio Trekker product also demonstrate why this suit is objectively baseless.  More specifically, Defendant explains that the technology in the Curio Trekker product is "fundamentally different" from that used in the Curio Seeker product (and from that described in the claims of the asserted patents)—in that the Trekker product tags nuclei in a given tissue by *diffusing* photocleavable spatial barcodes (i.e., by releasing the barcodes so they can *spatially seep* into the nuclei of cells in a tissue).  (*Id.* at ¶¶ 141-43)  This, Defendant asserts, is nothing like the approach described in the three patents asserted against the Trekker product, which teach that mRNAs *bind barcodes affixed to a solid surface.*  (*Id.* at ¶ 143; *see also* D.I. 62 at 12)  Yet Defendant pleads that 10x, who knew how the Trekker product worked (in part because 10x was aware of and has relied on a journal article that discusses the technology involved in the Trekker product), nevertheless falsely alleged in this case that the product infringes these three asserted patents.  (D.I. 49 at ¶¶ 141, 144-54)

The Court recognizes that Plaintiffs firmly contest the merit of these allegations. (*See* D.I. 52 at 10-15)[5] But patent litigation often (as it does here) involves complex questions of fact that are just not suitable for resolution at the pleading stage—a stage where the Court must take the plaintiff's well-pleaded assertions as true. If one takes Defendant's sham litigation allegations as true, then here the Court cannot conclude at this early stage that those allegations are implausible. *See Nuance Commc'ns, Inc. v. MModal LLC*, Civil Action No. 17-1484-MN-SRF, 2018 WL 6804488, at *4 (D. Del. Dec. 27, 2018) (determining that an antitrust plaintiff had pleaded sufficient facts to support its assertion that the antitrust defendant's patent litigation claims were objectively baseless, where: (1) the plaintiff's non-infringement allegations "detail elements of the [a]sserted [p]atents that are not met in the accused products[,]" and (2) it identified numerous prior art references that allegedly demonstrated why the antitrust defendant had "no basis" for alleging that the asserted patents were valid and enforceable), *report and recommendation adopted,* 2019 WL 181322 (D. Del. Jan. 11, 2019); *see also Azurity Pharms., Inc. v. Bionpharma Inc.*, 650 F. Supp. 3d 269, 280-81 (D. Del. 2023) (finding that an antitrust plaintiff's sham litigation-based claims should not be dismissed, where there were factual disputes regarding the plaintiff's allegations about objective baselessness—allegations premised on purportedly inconsistent positions the antitrust defendant had taken during prosecution, and

---

[5]      Plaintiffs' arguments about why Defendant's allegations do not demonstrate objective baselessness appear to require the Court to compare Defendant's accused product with 10x's product and the accused product at issue in the NanoString case, (D.I. 52 at 10-12), or to construe certain claim terms, (*id*. at 10-12, 13); *see Bausch & Lomb Inc. v. SBH Holdings LLC*, C.A. No. 20-1463-LPS, 2022 WL 856750, at *4 (D. Del. Mar. 23, 2022), or to make findings about whether certain claim language at issue in this case has a similar or different meaning than other claim language in other patents that was previously discussed with the PTO, (D.I. 52 at 12, 14-15). Those positions implicate fact-based merits disputes, which (for the reasons set out below) are inappropriate to resolve at the pleading stage.

on the plaintiff's assertions that certain patent claims were invalid for lack of written

description).  Indeed, as other judges in this District have repeatedly noted, it would be legally

improper for the Court to conclude otherwise at the pleading stage—in a case where the factual

matters relevant to Defendant's antitrust/sham litigation allegations are hotly disputed.  *See, e.g.,*

*Azurity Pharms.*, 650 F. Supp. 3d at 280 (acknowledging that while it is sometimes possible to

decide whether a lawsuit is objectively baseless as a matter of law at the pleading stage regarding

the sham litigation exception, it would be wrong to so conclude in a circumstance where the facts

relating to the antitrust allegations were not "undisputed"); *LKQ Corp. v. FCA US LLC*, Civil

Action No. 19-54-RGA-SRF, 2019 WL 13318371, at *6-7 (D. Del. Sept. 10, 2019) (same); *see*

*also Shionogi Pharma, Inc. v. Mylan, Inc.*, Civil Action No. 10-1077, 2011 WL 3860680, at *6

(D. Del. Aug. 31, 2011) (stating, in assessing a motion to dismiss, that the Court cannot decide

whether a lawsuit amounts to a sham litigation until it has made findings of fact on the

underlying patent claims) (citing cases).[6]

The Court next turns to the second part of the sham litigation test—i.e., whether there are

sufficient allegations that 10x's patent infringement suit conceals an attempt to interfere with

Defendant's business relations.  On this score, in the Answer, Defendant pleaded that 10x filed

the instant litigation with the intent to harm Defendant and drive it out of the relevant market, by:

---

[6]    In their reply brief, Plaintiffs cited to one patent/antitrust case from this Court, as
part of their argument that this Court "regularly dismisses sham litigation claims at the motion to
dismiss stage[.]"  (D.I. 64 at 4)  The Court simply notes that the circumstances in that case were
clearly, transparently different from what we have here.  *See, e.g., Pac. Bioscis. of Ca., Inc. v.
Oxford Nanopore Techs., Inc.*, C.A. No. 17-275-LPS, C.A. No. 17-1353-LPS, 2019 WL 668843,
at *4 (D. Del. Feb. 19, 2019) (dismissing an antitrust counterclaim for failure to sufficiently
plead the applicability of the sham litigation exception, but where the relevant allegations were
solely based on conduct regarding an inequitable conduct claim that was set out in the same
pleading—and where the Court had already found that the inequitable conduct claim was
insufficiently pleaded) (*cited in* D.I. 64 at 4).

(1) requiring it to "disclose to actual and potential investors and customers that [its products] were implicated by this [] litigation, and thus interfere with such business relationships[;]" (2) interfering with its ability to raise funding; and (3) wrongfully creating fear amongst its customers that if they purchased Defendant's product, they would be "left without access to the product" shortly thereafter.  (D.I. 49 at ¶¶ 154, 161, 163; *see also id*. at ¶ 111)  Defendant also pleads facts indicating that the cost to litigate Plaintiffs' infringement claims far exceeds any recovery that Plaintiffs could reasonably obtain, and it asserts that this demonstrates why 10x's subjective motivation is focused on harming Curio's business—not on winning a patent infringement suit on the merits.  (*Id*. at ¶¶ 159-60)  These allegations—taken in context with the remainder of the allegations in the Answer as to 10x's anticompetitive actions and motives— amount to plausible allegations which, at the pleading stage, suffice to meet the second part of this test.  *See NRT Tech. Corp. v. Everi Holdings Inc.*, C.A. No. 19-804-MN-JLH, 2020 WL 3403091, at *7 & n.29 (D. Del. June 19, 2020) (finding that an antitrust plaintiff had sufficiently alleged this second subjective element, where it asserted that the antitrust defendant had filed sham litigation in order to drive it out of the relevant market); *Brotech Corp. v. White Eagle Int'l Techs. Grp., Inc.*, No. Civ.A. 03-232, 2003 WL 22797730, at *4 (E.D. Pa. Nov. 18, 2003) (concluding that an antitrust plaintiff had plausibly pleaded the second subjective part of the sham litigation test, where it alleged that the antitrust defendants' motivation in filing suit was "not to obtain a judgment, but to pressure RenalTech into ceding control of its intellectual property in a coerced settlement").

Therefore, the Court recommends that Plaintiffs' Motion be denied as to Plaintiffs' argument that Defendant did not plead actionable anticompetitive conduct.

## 2.    Dangerous Probability of Achieving Monopoly Power

Plaintiffs' second argument for dismissal of the Second Counterclaim is that Defendant has insufficiently alleged that 10x has a dangerous probability of achieving monopoly power. (D.I. 52 at 18-19)

Monopoly power is "the power to control prices or exclude competition." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (internal quotation marks and citation omitted). And a "dangerous probability of monopoly may exist where the [the antitrust defendant] possesses a significant market share when it undertakes the challenged anticompetitive conduct." *Barr Lab'ys, Inc. v. Abbott Lab'ys*, 978 F.2d 98, 112 (3d Cir. 1992). But the claimant must allege more than "market share alone[.]" *Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.*, 159 F.3d 129, 141 (3d Cir. 1998). "In a determination of dangerous probability— and remembering that we are only considering 'the face of the complaint'—factors such as significant market share coupled with anticompetitive practices, barriers to entry, the strength of competition, the probable development of the industry, and the elasticity of consumer demand may be considered." *Broadcom*, 501 F.3d at 318. No one factor is dispositive. *Id*. This is "a particularly fact-intensive inquiry" that "[c]ourts typically should not resolve . . . at the pleading stage unless it is clear on the face of the complaint that the 'dangerous probability' standard cannot be met as a matter of law." *Id*. (internal quotation marks and citation omitted).

Here, 10x has not demonstrated that this is one of those atypical cases where the instant antitrust claim can be dismissed at the pleading stage on this ground. As an initial matter, as Defendant notes, (D.I. 62 at 15), it *did* plead facts plausibly asserting that 10x has a dominant market share in the relevant spatial transcriptomics field, that there are significant barriers to entry, and that 10x uses its market position to eliminate new rivals. On this front, Defendant alleges, citing to a 2022 publication, that 10x's Visium product is in a dominant market position,

with its market share estimated at well over 50%. (D.I. 49 at ¶ 157) Defendant also pleads that there are "significant barriers to entry to the market for [Next Generation Sequencing, or 'NGS']-based spatial transcriptome mapping" including "high startup costs in research and development, lack of manufacturing capability or infrastructure, lack of established distribution channels, business unwillingness to invest in expensive systems that are incompatible with others, as well as Plaintiffs' use of sham litigation" to eliminate competitors. (*Id.* at ¶ 158) And in addition to the campaign of alleged sham litigation, Defendant also asserts that 10x has "already eliminated potential competition through its acquisitions of [3 companies] and substantially all assets of Prognosys" and that it is "attempting to use acquisitions, patent aggregation, and objectively baseless litigation to obtain monopoly power in the spatial transcriptomics market." (*Id.* at ¶ 101; *see also id.* at ¶¶ 106, 111) These allegations, which address many of the relevant factors set out above, appear sufficient to plead attempted monopolization. *See Targus Int'l LLC v. Victorinox Swiss Army, Inc.*, Civil Action No. 20-464-RGA, 2020 WL 7264199, at *8 (D. Del. Dec. 10, 2020) (concluding that the antitrust plaintiff had sufficiently pleaded this factor, where in addition to having alleged that the antitrust defendant controlled a significant share of the relevant market for laptop bags, the plaintiff provided factual allegations regarding significant barriers to entry in that market, as well as regarding the nature of its opponent's anticompetitive conduct), *report and recommendation adopted*, 2020 WL 7714592 (D. Del. Dec. 29, 2020); *cf. Graco Inc. v. Carlisle Const. Materials, LLC*, Civil Action No. 21-245, 2024 WL 4384168, at *3 (D. Del. Oct. 3, 2024) (holding that an antitrust plaintiff could avoid summary judgment as to the issue of whether the antitrust defendant had a dangerous probability of achieving monopoly power, where there was evidence that the defendant had a "purportedly large market share[,]" that there were "high barriers to

entry" and that the defendant was insulated "by patent claims"); *see also Miller Indus. Towing Equip. Inc. v. NRC Indus.,* 659 F. Supp. 3d 451, 467 (D.N.J. 2023); *Del. Health Care, Inc. v. MCD Holding Co.*, 893 F. Supp. 1279, 1286-87 (D. Del. 1995).

Despite this, Plaintiffs make a few arguments as to why Defendant's pleading is insufficient on this score. The Court will address each in turn.

First, Plaintiffs state that Defendant alleges merely "that it has been harmed by the public perception that Curio may 'suffer a similar fate' as NanoString, which lost a verdict of willful infringement and filed for bankruptcy[,]" (D.I. 52 at 18 (quoting D.I. 49 at ¶ 163)); Plaintiffs argue that this allegation is insufficient to help make out a plausible claim here, because "if 10x were somehow able to obtain a monopoly by obtaining the same result against Curio that it obtained from the jury against NanoString, any monopoly so achieved would be a legal one, not subject to the Sherman Act[,]" (*id.*). The Court disagrees with this logic. In its case against Vizgen, 10x raised a near identical argument to that which it makes here. There, as here, Vizgen had asserted a claim of attempted monopolization under Section 2, and 10x moved to dismiss that claim in part by asserting that Vizgen's allegations could not suffice since if 10x (and its co-plaintiff) succeeded on its patent infringement claims at trial, then "any monopoly so achieved will be a legal one." *Vizgen, Inc.*, 681 F. Supp. 3d at 269-70 (internal quotation marks and citation omitted). But the District Judge overseeing that case[7] rejected this argument, explaining that "[t]his contention is circular[,]" *id.* at 270; *see also* (D.I. 62 at 15-16)—in the sense that 10x's position assumes an outcome that is at odds with the *actual allegations in the relevant pleading* (i.e., this 10x's patent infringement claims are a sham and are baseless).

---

[7]    United States District Judge Matthew Kennelly, sitting by designation.

Next, Plaintiffs, citing to two cases—*Bio-Rad Lab'ys, Inc. v. 10x Genomics, Inc.*, 483 F. Supp. 3d 38, 65 (D. Mass. 2020) and *Chip-Mender, Inc. v. Sherwin-Williams Co.*, No. C 05-3465 PJH, 2006 WL 13058, at *4-5 (N.D. Cal. Jan. 3, 2006)—assert that "[c]ourts have rejected similar attempts to characterize meritorious patent litigation as supporting the 'dangerous probability' prong." (D.I. 52 at 18)  Again though, the Court notes that Defendant's Answer plausibly pleads that 10x's patent litigation claims here are *not* "meritorious."  Moreover, the *Vizgen* Court also addressed this argument.  It rejected it, noting that *Bio-Rad* and *Chip-Mender* were not apposite caselaw, since they "do not address allegations akin to [the defendant's] in this case of a broader anticompetitive scheme in which patent litigation plays an enforcement role." *Vizgen*, 681 F. Supp. 3d at 270; *see also* (D.I. 52 at 18).  Here, as in *Vizgen*, the Answer includes a number of allegations asserting that 10x's participation in an anticompetitive scheme goes beyond just the filing of the instant alleged sham patent litigation.  (D.I. 49 at ¶¶ 101, 106, 111)

Lastly, Plaintiffs quibble with some of the facts that Defendant did or did not plead in support of this element—suggesting that Defendant's allegations could have included some additional details (i.e., "in sales or dollars") or could have been a bit more "current[,]" or the like. (D.I. 52 at 18-19)  Those arguments are the stuff of summary judgment briefing; they are not winners at the pleading stage.

For the above reasons, the Court recommends that the Motion be denied as to the Second Counterclaim.

### C.    Third and Fourth Counterclaims

With regard to the Third and Fourth Counterclaims, Plaintiffs argue these claims fail under California antitrust law to the same extent that the First and Second Counterclaims fail under federal antitrust law.  (D.I. 52 at 19)  The Court agrees that both of these state law

counterclaims rise or fall with the federal antitrust counterclaims on which they depend. *See Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel. Inc.*, C.A. No. 20-613-LPS, 2022 WL 1224903, at *7 (D. Del. Apr. 26, 2022); *see also Vizgen*, 681 F. Supp. 3d at 270; *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, No. CV F 09-0560 LJO SMS, 2011 WL 2678879, at *14 (E.D. Cal. July 7, 2011).

Therefore, the Court recommends dismissal without prejudice of the Third Counterclaim, which alleges that Plaintiffs violated California's Cartwright Act by conspiring together to form an unlawful trust, because it relies on the conspiracy-related allegations in the First Counterclaim (which the Court has found wanting). (D.I. 49 at ¶¶ 188-89; *see* D.I. 52 at 8) With regard to the Fourth Counterclaim, the Court recommends that Plaintiffs' Motion be granted-in-part and denied-in-part. More specifically, it recommends that the Motion be denied as to the portion of this counterclaim that relies on "attempted monopolization in violation of 15 U.S.C. § 2" (i.e., mirroring the allegations as to the Second Counterclaim), and that the Motion be granted without prejudice as to those portions of the Fourth Counterclaim that rely on the conspiracy-related allegations implicated in the First and Third Counterclaims. (*See* D.I. 49 at ¶ 196)

### D.     Stay and Bifurcation

Lastly, Plaintiffs move the Court to bifurcate any of the surviving Antitrust Counterclaims from Plaintiffs' infringement claims, and then to stay those Antitrust Counterclaims. (D.I. 52 at 19-20)

The Court declines to address this aspect of the Motion at this time. As Defendant asserts (and Plaintiffs did not deny), (D.I. 62 at 16; D.I. 64 at 7), Plaintiffs did not meet and confer with Defendant about this bifurcation/stay issue prior to filing the Motion, in violation of the District Judge's procedures and District of Delaware Local Rule 7.1.1. In light of that fact, *see Bausch &*

*Lomb Inc. v. SBH Holdings LLC*, Civil Action No. 20-1463-GBW-CJB, D.I. 77 (D. Del. May 12, 2023), in light of the fact that these bifurcation and stay decisions are discretionary (and will impact the District Judge's management of the case in the future), and because the ultimate outcome of the Motion (including resolution of any objections filed as to the instant Report and Recommendation) will impact the analysis of any bifurcation and stay issues, the Court instead recommends that: (1) after the instant Motion is finally resolved, the parties be ordered to appropriately meet and confer regarding these matters; and (2) thereafter, they be required to provide a status letter updating the Court on how the resolution of the Motion and their meet and confer discussions have impacted their positions on bifurcation/stay issues.

## IV.    CONCLUSION

For the foregoing reasons, the Court recommends that Plaintiffs' Motion be GRANTED-IN-PART and DENIED-IN-PART. More specifically, the Court recommends that the Motion be: (1) GRANTED as to the First and Third Counterclaims, without prejudice; (2) DENIED as to the Second Counterclaim; and (3) GRANTED-IN-PART without prejudice as to the Fourth Counterclaim (as to those portions of the counterclaim premised upon the grounds for relief stated in the First and Third Counterclaims) and DENIED-IN-PART as to the Fourth Counterclaim (as to the portions of the counterclaim premised upon the grounds for relief stated in the Second Counterclaim). And the Court recommends that no decision be made at this time regarding Plaintiffs' request for bifurcation or a stay (for the reasons set out above).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the

loss of the right to *de novo* review in the district court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated:  January 29, 2025

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE